**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- x
                                                 :

KARLA ARMENTA, TAMARA CASTILLO APONTE,    :
MARIA MAGDELENA ASTACIO CASTILLO,    :
YASTANY ASTACIO, RUSSELL BRIM, ASHER    :
BRIM, I.B., WALTON SERRANO-COLON, YENNY    :
CRUZ, MARIA DOMINGUEZ, SHIRLEY ESPINOSA,    :
ISMAEL GARCIA, KEITH GOULBOURNE, ALICIA    :
GOULBOURNE, HANIF MOHAMMED, YAANA    :
PENA,  L.P., YUNISSA SOTO, DWAYNE TAYLOR,    :
ESTHER HAZEL, ELIZABETH DONEGAN, MARIE    :
GREGOIRE, JESUS RAMOS, FILIPPO GIAMBIANCO,    :
JULIE LOPEZ, JASMINE JOHNSON AND DEMIKA    :   No. 16-CV-6013
HUNTER,    :
                          :
            Plaintiffs,    :   **VERIFIED COMPLAINT**
                          :
           v.    :
                          :
CITY OF NEW YORK and NEW YORK CITY    :
DEPARTMENT OF HOMELESS SERVICES,    :
                          x
           Defendants.

-----------------------------------------------------------------------

        Plaintiffs Karla Armenta, Tamara Castillo Aponte, Maria Magdelena Castillo

Aponte, Yastany Astacio, Russell Brim, Asher Brim,  I.B., a minor, by and through her

father and natural guardian, Russell Brim, Walton Serrano-Colon, Yenny Cruz, Maria

Dominguez, Shirley Espinosa, Ismael Garcia, Keith Goulbourne, Alicia Goulbourne,

Hanif Mohammed, Yaana Pena and  L.P., a minor, by and through her mother and natural

guardian, Yaana Pena, Yunissa Soto, and Dwayne Taylor,  Esther Hazel, Elizabeth

Donegan, Marie Gregoire, Jesus Ramos, Filippo Giambianco, Julie Lopez, Jasmine

Johnson and Demika Hunter (collectively, the "Plaintiffs") by their attorneys, The New York Center for Law and Justice, plead and allege as follows:

## PRELIMINARY STATEMENT

1.   This action arises from the repeated, ongoing, and systematic failure of the City of New York ("City"), New York City Department of Homeless Services ("DHS" and, together with the City of New York, the "City Defendants") to provide effective communication between Defendants' homeless shelter staff and Plaintiffs Karla Armenta, Tamara Castillo Aponte, Russell Brim, Walton Serrano-Colon, Yenny Cruz, Maria Dominguez, Shirley Espinosa, Ismael Garcia, Keith Goulbourne, Alicia Goulbourne, Hanif Mohammed, Yaana Pena, Yunissa Soto, and Dwayne Taylor, Esther Hazel, Elizabeth Donegan, Marie Gregoire, Jesus Ramos, Filippo Giambianco, Julie Lopez, Jasmine Johnson and Demika Hunter (collectively "Plaintiffs") who are deaf, read only a very limited amount of written English, and rely on American Sign Language ("ASL") or a Certified Deaf Interpreter (CDI) to communicate with others.

2.   Karla Armenta, Tamara Castillo Aponte, and her two children, Maria Magdelena Castillo Aponte ("Maria"), and Yastany Astacio ("Yastany"), (collectively, "Castillo Aponte Plaintiffs"), Russell Brim and his two children, Asher Brim ("Asher") and I.B., a minor, (collectively, "Brim children"), together with Mr. Brim, ("Brim Plaintiffs"), Walton Serrano-Colon, Yenny Cruz, Maria Dominguez, Shirley Espinosa, Ismael Garcia, Keith Goulbourne, Alicia Goulbourne  (together "Goulbourne Plaintiffs"), Hanif Mohammed, Yaana Pena and her minor child, L.P. ( collectively "Pena Plaintiffs"), Yunissa Soto and Dwayne Taylor, Esther Hazel, Elizabeth Donegan, Marie Gregoire, Jesus Ramos, Filippo Giambianco, Julie Lopez, Jasmine Johnson and Demika Hunter

were denied and continue to be denied equal access to benefits, services, and effective communication with Defendants' staff because of Defendants' repeated failure to provide them with qualified sign language interpreter services or auxiliary aids.

3.   Defendants have denied Plaintiffs the opportunity to participate in, question, or understand discussions and decisions concerning their residence, or their families' residence, in Defendants' shelters.  Defendants have denied Plaintiffs the benefit of meetings with shelter case-workers.  Defendants have denied Plaintiffs the opportunity to participate in shelter-wide discussions regarding the availability of public benefits and job opportunities.  Defendants have denied Plaintiffs the ability to express questions or complaints regarding shelter conditions.  This denial to Plaintiffs of access to shelter programs and services available to hearing individuals constitutes discrimination on the part of Defendants in violation of Title II of the Americans with Disabilities Act of 1990 (the "ADA"), Title III of the ADA, Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), the New York City Human Rights Law, and the New York State Human Rights Law.  In addition, Defendants were negligent, careless, wanton and reckless in their disregard of the Plaintiffs and in their acts and omissions towards the Plaintiffs.

4.   As a result of Defendants' failure to abide by the law and provide qualified sign language interpreters or auxiliary aids,  I.B., and L.P., infant Plaintiffs in this action (collectively "Plaintiff Children"), suffered extreme emotional distress.  Defendants' discrimination against  and other conduct forced the Plaintiff Children to participate in sophisticated discussions regarding housing, health records, public benefits, and other issues that were exceedingly inappropriate for children and young adults.  Furthermore,

in violation of the law, Defendants repeatedly asked Castillo Aponte Children, Asher Brim,  and the Yaana Pena's minor child to interpret conversations and key documents on behalf of Russell Brim, Tamara Castillo Aponte and Yaana Pena, respectively, which placed the children in an unacceptable position of responsibility considering the seriousness of the circumstances.

5.   Defendants' failure to provide access to effective communication to Karla Armenta, Tamara Castillo Aponte, Russell Brim, Walton Serrano-Colon, Yenny Cruz, Maria Dominguez, Shirley Espinosa, Ismael Garcia, Keith Goulbourne, Alicia Goulbourne, Hanif Mohammed, Yaana Pena, Dwayne Taylor, Esther Hazel, Elizabeth Donegan, Marie Gregoire, Jesus Ramos, Filippo Giambianco, Julie Lopez, Jasmine Johnson and Demika Hunter violates Title III of the ADA, Section 504 of the Rehabilitation Act, New York City Human Rights Law, and the New York State Human Rights Law.

6.   In addition, City Defendants' failure to provide effective communication assistance to Karla Armenta, Tamara Castillo Aponte, Russell Brim, Walton Serrano-Colon, Yenny Cruz, Maria Dominguez, Shirley Espinosa, Ismael Garcia, Keith Goulbourne, Alicia Goulbourne, Hanif Mohammed, Yaana Pena, Dwayne Taylor and Esther Hazel, Elizabeth Donegan, Marie Gregoire, Jesus Ramos, Filippo Giambianco, Julie Lopez, Jasmine Johnson and Demika Hunter violates Title II of the ADA.

7.   Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees.

**PARTIES**

8.   Plaintiff Karla Armenta resides at 351 East Speedway Blvd., Tucson, AZ  85710.

4

9.   Tamara Castillo Aponte, and her two children, reside at 620 East 137th Street, Bronx, New York 10454.

10. Plaintiffs Russell Brim and his two children, Asher Brim and I.B. reside at New York, New York.

11.   Plaintiff Walton Serrano-Colon last resides at Project Renewal 4380 Bronx Boulevard, Bronx, NY 10466.

12. Plaintiff Yenny Cruz resides at a shelter in the City of New York.

13. Plaintiff Maria Dominguez resides at 5275 Chesapeake Ave. Orlando, Florida, 32808.

14. Plaintiff Shirley Espinosa resides at a shelter in Staten Island, New York.

15. Plaintiff Ismael Garcia resides at 5275 Chesapeake Ave. Orlando, Florida, 32808.

16. Plaintiffs Keith Goulbourne and Alicia Goulbourne, reside at 107 Willow Bend Drive, Owings Mills,  Maryland.

17. Plaintiff Hanif Mohammed resides at 681 Clarkson Avenue, Brooklyn, NY 11203.

18. Plaintiffs Yaana Pena and her two minor children reside at Bronx, New York.

19. Plaintiff Yunissa Soto resides in Puerto Rico.

20. Plaintiff Dwayne Taylor resides at 148 Myrtle Avenue, Apt. 11, Stamford, CT  06902.

21. Plaintiff Esther Hazel resides at 2272 Andrews Avenue, Apt. 1A, Bronx, NY  10456.

22. Plaintiff Elizabeth Donegan resides at Beach Residence, 316 Beach 65th Street, Arverne, NY 11221.

23. Plaintiff Marie Gregoire resides at 1980 Park Avenue, Apt. 4A, New York NY 10037.

24. Plaintiff Jesus Ramos resides in Puerto Rico.

25. Plaintiff Filippo Giambianco resides at 102 Ralph Avenue, Brooklyn, New York.

26. Plaintiff Julie Lopez resides in Bronx, New York.

27. Plaintiff Jasmine Johnson last resided at 1397 Stebbins Avenue, Bronx, New York.

28. Plaintiff Demika Hunter last resided at 1397 Stebbins Avenue, Bronx, New York.

29. Defendant City of New York is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York. The City of New York has established and maintains the Department of Homeless Services ("DHS") as a constituent department or agency of the City of New York.

30. Defendant DHS, located at 33 Beaver Street, New York, NY 10004, is a New York City agency that provides homeless services and operates or funds numerous homeless shelter facilities in New York City, including the Prevention Assistance and Temporary Housing shelter intake office at 46 Powers Avenue, Bronx, New York 10454 (the "PATH").

31. Upon information and belief, City Defendants exercise control over the shelter services system of New York City, serving as sponsors or parent agencies of intake centers and homeless shelters and their respective operators and agents.

32. Upon information and belief, City Defendants provide funding for the shelters and their respective shelter operators and agents.

33. Upon information and belief, City Defendants supervise the operators of, or otherwise operate, the shelters where plaintiffs reside or have resided.

## JURISDICTION AND VENUE

34. This Court has original jurisdiction over this action pursuant to §§ 504 and 505 of the Rehabilitation Act and the ADA, inasmuch as federal questions are at issue, and also has pendent jurisdiction over this matter based on the nonfederal claims.

35. This Court has personal jurisdiction over Defendants because Defendants reside in New York.

36. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and because acts and omissions of Defendants giving rise to this action occurred in this district.

## FACTS – PLAINTIFF KARLA ARMENTA

### Karla Armenta arrives at PATH and is Denied an ASL Interpreter

37. On or around October 16, 2013, Karla Armenta visited PATH, City Defendants' shelter processing center, to inquire about temporary shelter and permanent housing.

38. Ms. Armenta arrived at PATH with her friend, Yunissa Soto, who is also Deaf and who is also a Plaintiff in this matter.

39. At PATH, Ms. Armenta asked City Defendants' staff for a sign language interpreter, by presenting a handwritten request explaining that both she and Ms. Soto were Deaf and required a sign language interpreter to communicate.

40. Ms. Armenta handed this written note to a staff person at PATH Shelter explaining that the two women were Deaf.

41.  Ms. Soto saw Ms. Armenta hand this note to a staff person at PATH Shelter.

42. Ms. Armenta tried to communicate in writing with Shelter staff at PATH by writing back in forth in English, although Ms. Armenta has limited English language skills.

43. Ms. Armenta then requested that she speak to a staff member at PATH who spoke Spanish, and tried communicating back in forth in written Spanish with that staff person, although Ms. Arementa has limited Spanish language skills.

44. In addition to her written requests, Ms. Armenta tried to vocalize, in Spanish, that she was deaf and needed a sign language interpreter to communicate.

45. Ms. Armenta was not provided with a sign language interpreter while she was at the PATH Shelter.  She remained at PATH until she was transferred to the Franklin Shelter later that same day.

**Karla Armenta arrives at Franklin Shelter and is Denied an Interpreter During Meetings with her Case Manager**

46. On or around October 16, 2013, City Defendants transported Ms. Armenta from PATH to the Franklin Shelter, a shelter for single adults.

47. While at the Franklin Shelter, Ms. Armenta requested the presence of a sign language interpreter.

48. Ms. Armenta remained at the Franklin Shelter from October 16, 2013 until December 19, 2013.

49. In the time that Ms. Armenta resided at the Franklin Shelter, she met with her case manager every two weeks.

50. Ms. Armenta communicated to her case manager that she could not understand what was being said, and her case manager was aware that Ms. Armenta was Deaf and that Ms. Armenta communicated using American Sign Language.

51. Ms. Armenta used written notes to communicate with her case manager explaining that she did not understand what was being said, and the case manager refused to write back and forth with her and request a sign language interpreter.

52. The case manager would only communicate with Ms. Armenta using spoken English.

53. Ms. Armenta asked a Spanish speaking friend to go with her to approximately three (3) meetings with her case manager at the Franklin Shelter because Ms. Armenta believed that she could read the lips of her Spanish-speaking friend more effectively than those of her case manager, who only spoke English.

54. Despite the presence of her Spanish-speaking friend, Ms. Armenta was unable to understand or effectively communicate with her case manager at the Franklin Shelter.

**Ms. Armenta was Denied an Interpreter During General Meetings at the Franklin Shelter**

55.  During her stay at the Franklin Shelter, general meetings for residents would be held routinely.

56. Ms. Armenta did not know when or where these meetings were held, and did not receive notice of these meetings.

57. Ms. Armenta would occasionally discover that these meetings were in progress in the Franklin Shelter and would see the other residents attending these meetings.

58. Ms. Armenta did, on occasion, remain in the meetings but she did not know what was being discussed in the meetings because there was no sign language interpreter present.

59. Ms. Armenta provided written requests to staff at the Franklin Shelter that explained she was deaf and needed a sign language interpreter to be provided for the general meetings at the Franklin Shelter.

60. Despite written requests to staff at Franklin Shelter, the Franklin Shelter failed to provide Ms. Armenta with a sign language interpreter for any general meetings during the time that Ms. Armenta was a resident in their facilities.

**Karla Armenta arrives at Samaritan Village Shelter and is Denied an ASL Interpreter for Meetings with her Case Manager**

61. On or about December 19, 2013, Ms. Armenta was transferred from the Franklin Shelter to the Samaritan Village Shelter, where she currently resides.

62. Since she began living at the Samaritan Village Shelter, Ms. Armenta had been meeting with her case manager every two weeks.

63. For the first five (5) months that Ms. Armenta was a resident at the Samaritan Village Shelter, she had a Spanish speaking case manager.

64. Every two weeks Ms. Armenta would meet with her Spanish speaking case manager, and Ms. Armenta attempted to vocalize to her Spanish speaking case manager, in Spanish, that she was deaf and needed a sign language interpreter to communicate.

65. After five (5) months of living at Samaritan Village Shelter, Ms. Armenta received a different case manager who spoke English.

66. Ms. Armenta communicated her requests for a sign language interpreter in writing to her English speaking case manager every two weeks when she met with her case manager at the Samaritan Village Shelter and continued to communicate her requests for a sign language interpreter in writing to her English speaking case manager every two weeks when Ms. Armenta met with the case manager.

67. Since Ms. Armenta had been a resident at the Samaritan Village Shelter beginning on or about December 19, 2013, Ms. Armenta had not received a sign language interpreter for any meetings with her case managers.

68. Ms. Armenta had not received a sign language interpreter, despite her vocalized and written requests for a sign language interpreter to be present during meetings with her case managers.

**Karla Armenta is Denied an ASL Interpreter for General Meetings at the Samaritan Village Shelter**

69. When Ms. Armenta first arrived at the Samaritan Village Shelter on or about December 19, 2013, Ms. Armenta requested that she have an interpreter present for general meetings that would be held at the Samaritan Village Shelter.

70. Despite Ms. Armenta's request to staff at the Samaritan Village Shelter, that a sign language interpreter be present for general meetings, a sign language interpreter has

not been provided at any time for general meetings at the Samaritan Village Shelter since

Ms. Armenta began living there on or about December 19, 2013.

**Ms. Armenta Has Experienced and Continues to Experience Extreme Emotional Distress**

71. Ms. Armenta has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

72. Ms. Armenta experienced and continues to experience emotional distress.

73. Ms. Armenta suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Armenta.

74. Ms. Armenta was unable to communicate with staff about housing opportunities, employment, and other services that she may be qualified for as a direct result of not having a sign language interpreter present at meetings at the Samaritan Village Shelter.

75. Defendant's failure to provide interpretive services caused and continues to cause Ms. Armenta to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness.

## FACTS – PLAINTIFF YUNISSA SOTO

76. Plaintiff Yunissa Soto is deaf and communicates by using American Sign Language.

**Ms. Soto Arrives at PATH**

77. On or about October 16, 2013, Ms. Soto arrived at PATH with her friend and co-plaintiff, Karla Armenta.

78. Ms. Soto's friend, Karla Armenta, requested a sign language interpreter at PATH for and on behalf of both women.

79. Despite Ms. Armenta's request that she and Ms. Soto be provided with a sign language interpreter, the PATH Shelter failed to provide either Ms. Armenta or Ms. Soto with an interpreter at any time while they remained at the PATH Shelter.

**Ms. Soto Arrives at Franklin Shelter**

80. On or about October 16, 2013, Ms. Soto was transferred from PATH to the Franklin Women's Shelter and remained there until on or about November 21, 2013.

81. In the time that Ms. Soto resided at the Franklin Women's Shelter she met with her case manager every two weeks.

82. Each time Ms. Soto met with her case manager she requested that a sign language interpreter be present.

83. During the time Ms. Soto resided at the Franklin Shelter, Ms. Soto made multiple requests to her case manager that an interpreter be provided during the meetings with her case manager by providing written requests for an interpreter during their meetings, even though Ms. Soto had limited English language skills, that specified that Ms. Soto was deaf and needed an interpreter to communicate

84. Ms. Soto provided her case manager with a card that contained information indicating that Ms. Soto was requesting a sign language interpreter.

85. In an effort to obtain an interpreter for herself, Ms. Soto called the number on the card by using a video relay system in an attempt to obtain an interpreter for Ms. Soto's meetings with her case manager at the Franklin Shelter.

86. Despite Ms. Soto's requests and her efforts to contact an interpreter directly, she never received a sign language interpreter for any of the meetings she had with her case manager while she resided at the Franklin Women's Shelter.

**Ms. Soto is Denied an Interpreter for General Meetings at the Franklin Shelter**

87. General meetings were routinely held for residents at the Franklin Women's Shelter.

88. During the time that Ms. Soto resided at the Franklin Shelter, she would request to office staff that an interpreter be provided for her during the general meetings at least once per week.

89. Ms. Soto would communicate these requests to staff at the Franklin Shelter by providing them with written requests on paper explaining that she was deaf and required a sign language interpreter to understand what was being said during the general meetings.

90. Ms. Soto also provided Shelter staff with a card given to her that contained information on how a sign language interpreter may be contacted.

91. Despite Ms. Soto's repeated requests for an interpreter for the general meetings, she was never provided with an interpreter for the general meetings at any time while she resided at the Franklin Women's Shelter.

92. At one point, Franklin Women's Shelter staff informed her that an interpreter was coming, but an interpreter never arrived.

**Ms. Soto Arrives at Broadway Shelter**

93. On or about November 21, 2013, Ms. Soto arrived at the Broadway House Shelter located at 1245 Broadway, Brooklyn, New York 11221, where she remained until on or about December 19, 2013.

**General Meetings at the Broadway Shelter**

94. General meetings were held for residents at the Broadway House Shelter.

14

95. Ms. Soto did not attend general meetings while she resided at the Broadway House Shelter because she was unaware that any general meetings were being held and she was not notified that any meetings were occurring.

96. On or about December 19, 2013, Ms. Soto left the Broadway House Shelter.

**Ms. Soto Has Experienced and Continues to Experience Extreme Emotional Distress**

97. Ms. Soto has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

98. Ms. Soto experienced and continues to experience emotional distress.

99. Ms. Soto suffers from damages as a direct result of the City Defendants' failure to provide a sign language interpreter to Ms. Soto.

100. Ms. Soto was unable to communicate with staff about housing opportunities, employment, and other services that she may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters.

101. City Defendants' failure to provide interpretive services caused Ms. Soto to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she attempted to make her way through, and ultimately out of, the New York City shelter system.

## FACTS – BRIM PLAINTIFFS

102. Plaintiff Russell Brim is latent deaf.

103. Mr. Brim communicates using Communication Access Real-time Translation ("CART"), which is a method of translating spoken language into a typed format that is displayed on a screen.

104.    On or about February 2012 through April 2012, Mr. Brim was a resident of the Catherine Street Shelter located at 78 Catherine Street, New York, New York.

105.    While Mr. Brim was a resident at the Catherine Street Shelter he met with his case manager every two weeks.

106.    Mr. Brim vocalized his request for CART by vocalizing directly to his case manager that he was deaf and needed CART.

107.    On multiple occasions while Mr. Brim was a resident at the Catherine Street Shelter, his case manager requested that Mr. Brim's son, Asher Brim, interpret for him during the meetings with the case manager and denied him CART.

108.    During the time that Mr. Brim resided at the Catherine Street Shelter, he never received access to a CART interpreter for meetings with his case manager.

109.    Mr. Brim requested that CART services be provided during general meetings at the Catherine Street Shelter by vocalizing this request to staff at the Catherine Street Shelter.

110.    Despite his requests, the Catherine Street Shelter staff never provided Mr. Brim with a CART for any of the general meetings held at the Catherine Street Shelter.

**Mr. Brim Arrives at the Urban Family Center Shelter**

111.    On or about April 27, 2012, Mr. Brim transferred to the Urban Family Center Shelter located at 130 Baruch Place in New York, New York, where he lived until on or about September 6, 2012.

112.    While residing at the Urban Family Center, Mr. Brim met with his case manager every two weeks.

113.    Mr. Brim made a verbal request for CART services at every meeting he had with his case manager while residing at the Urban Family Center.

114.    Despite his verbal requests for CART, the Shelter staff at the Urban Family Shelter failed to provide Mr. Brim with CART services for any of the meetings that Mr. Brim had with his case manager while residing at the Urban Family Shelter.

115.    Mr. Brim's case manager would rely, instead, on Mr. Brim's son, Asher Brim, to communicate with Mr. Brim.

116.    While Mr. Brim resided at the Urban Family Center Shelter, the Shelter would hold general meetings for residents once each month.

117.    Mr. Brim verbally requested to the Urban Family Center Shelter director, as well as other staff, that CART interpreter services be provided to him during the general meetings because he was deaf and could not understand what was being said in the meetings.

118.    Mr. Brim's son Asher also requested that CART interpreter services be provided for Mr. Brim during the general meetings.

119.    Despite Mr. Brim's request and his son's request that CART services be provided, staff at the Urban Family Center failed to provide Mr. Brim with CART interpreter services during the monthly held general meetings.

**Mr. Brim Arrives at the Tov Hotel-Bronx Shelter and is Denied Interpretive Services**

120.    On or about September 11, 2012, Mr. Brim transferred from the Urban Family Center to the Tov-Hotel Bronx Shelter located at 2287 University Avenue in Bronx, New York.

121.     Mr. Brim was assigned a case manager, a man named "Marshall" at the Tov Hotel Bronx Shelter.

122.     Mr. Brim met with Marshall every day while living at the Tov Hotel Bronx Shelter and verbally requested to Marshall that CART services be provided for him.

123.     In addition to verbal requests, Mr. Brim wrote down requests for CART interpreter services and gave those written requests to Marshall.

124.     Despite Mr. Brim's written and verbal requests for CART services, the Tov Hotel Bronx Shelter failed to provide Mr. Brim with CART interpretive services.

**Mr. Brim Arrives at the Freedom House Shelter and is Denied Interpretive Services**

125.     On or about December 27, 2012, Mr. Brim was transferred from the Tov Hotel Bronx Shelter to the Freedom House Shelter located at 316 West 95th Street in Manhattan, New York.

126.     At the Freedom House Shelter, Mr. Brim met with his case manager every two weeks.

127.     At his first meeting with his case manager, Mr. Brim asked for CART interpreter services by vocalizing to his case manager that he was deaf and required CART to communicate.

128.     The Freedom House Shelter obtained a sign language interpreter for Mr. Brim, but not CART.

129.     Because Mr. Brim lost his hearing later in life, he does not communicate by American Sign Language, but communicates instead through typed correspondence such as CART.

130.   Mr. Brim was able to read the sign language interpreter's lips to a very limited extent, but missed a significant amount of what was being said in the meetings despite the fact that a sign language interpreter had been provided.

131.   As a result, Mr. Brim repeated his requests to his case manager that he type back and forth with him or that a CART interpreter be provided.

132.   Mr. Brim's case manager did not type and did not obtain a CART interpreter for Mr. Brim, and instead continued to hire a sign language interpreter for the purposes of having meetings with Mr. Brim.

133.   As a result, Mr. Brim was unable to effectively communicate with his case manager while he was a resident at the Freedom House Shelter.

134.   General meetings were routinely held at the Freedom House Shelter.

135.    No CART interpreter services were provided for Mr. Brim at the general meetings while he was a resident at the Freedom House Shelter.

136.   As a result, Mr. Brim did not attend the general meeting at the Freedom House Shelter because he was unable to understand what was being said or participate in the meetings.

137.   Additionally, during his stay at Freedom House Shelter, Mr. Brim was separated from his daughter, I.B.

138.   I.B. was relocated to another residence in Manhattan.

139.   Mr. Brim was unable to effectively communicate with staff at Freedom House Shelter in order to discuss and analyze how his family could be reunited, whether at Freedom House Shelter or another shelter.

140.   In November 2013, Mr. Brim left the Freedom House Shelter.

**Brim Plaintiffs Have Experienced and Continue to Experience Extreme Emotional Distress**

141.    Mr. Brim has been directly harmed by The City Defendants' failure to provide CART interpretive services.

142.    Mr. Brim experienced and continues to experience emotional distress.

143.    Mr. Brim suffers from damages as a direct result of City Defendants' failure to provide interpretive services to Mr. Brim.

144.    Mr. Brim was unable to communicate with staff about housing opportunities, employment, the separation of his daughter, and other services that he may have been qualified for as a direct result of not having a CART Interpretive services present at meetings at the City Defendants' shelters.

145.    Asher Brim has been directly harmed by City Defendants' failure to provide interpretive services.

146.    Asher Brim was frequently asked by shelter personnel to interpret on behalf of his father, causing him to suffer extreme emotional distress.

147.    Mr. Brim and his minor child, I.B. suffered and continue to suffer extreme emotional distress because Mr. Brim was unable to communicate with shelter staff or his case manager about the needs of his minor child, I.B. including, issues relating to her health and education while residing in the City Defendants' shelters. Mr. Brim's minor child, I.B., was separated from Mr. Brim, in part because he was unable to communicate with shelter staff and City employees and she was placed in another residence, as mentioned, only to be reunited when Mr. Brim secured permanent housing.

148.    City Defendants' failure to provide interpretive services caused the Brim Plaintiffs to experience overwhelming stress, fear, frustration, uncertainty, confusion and

feelings of helplessness as they attempted to make their way through (and ultimately, out of) the New York City shelter system.

## FACTS – CASTILLO APONTE PLAINTIFFS

**Castillo Aponte Plaintiffs' 2004 Trip to PATH and Stay at the Bay Family Center**

149.    In September 2004, Ms. Castillo Aponte and her daughters Maria and Yastany Astacio visited the PATH processing center for the first time to inquire about temporary shelter and permanent housing.  A family friend accompanied the plaintiffs.

150.    The friend explained to PATH personnel that Ms. Castillo Aponte was deaf and requested an interpreter on her behalf.  When no such interpreter was provided, the friend agreed to interpret on Ms. Castillo Aponte's behalf during the intake process. The friend was not a certified ASL interpreter, has no formal training in ASL, and is not otherwise qualified to perform interpretive services.

151.    Although City Defendants' staff at PATH knew that Ms. Castillo Aponte was deaf, they failed to provide her an ASL interpreter.  As a result, Ms. Castillo Aponte was not able to communicate that she preferred to be assigned to a shelter in Manhattan, and was instead assigned to the Bay Family Center in Sheepshead Bay, Brooklyn.

152.    Through the friend, Ms. Castillo Aponte set up two appointments at the PATH facility for the following days to complete her intake with an ASL interpreter present.

153.    Castillo Aponte Plaintiffs arrived at the Bay Family Center later that same day, again accompanied by her friend.  The friend notified the Bay Family Center staff that Ms. Castillo Aponte was deaf and would need an interpreter.  When no such interpreter was provided, the friend again agreed to interpret on Ms. Castillo Aponte's behalf during the intake process.

154. After staying the night at the Bay Family Center, Ms. Castillo Aponte returned to PATH on successive days for the appointments she had set up previously with PATH personnel. An interpreter was only made available at one of the meetings.

155. Castillo Aponte Plaintiffs remained at the Bay Family Center for approximately seven months. During that time, the Bay Family Center arranged for Ms. Castillo Aponte to attend biweekly meetings with a caseworker. However, instead of providing a trained interpreter for those meetings, the Bay Family Center would call the plaintiffs' friend and ask him to interpret on Ms. Castillo Aponte's behalf. At the first such meeting, the friend requested an interpreter on Ms. Castillo Aponte's behalf. The caseworker responded that the shelter could not afford one.

156. Eventually, in March 2005, Castillo Aponte Plaintiffs were able to leave the Bay Family Shelter and moved into a one-bedroom apartment.

**Castillo Aponte Plaintiffs Leave their Apartment and Eventually Return to PATH**

157. Castillo Aponte Plaintiffs returned to the PATH processing facility on or around May 3, 2011, accompanied by a family friend.

**Castillo Aponte Plaintiffs Are Again Denied an ASL Interpreter at PATH**

158. The family friend, who is fluent in ASL, but who has no formal qualifications as an interpreter, was not allowed inside the PATH facility because he is not related to Ms. Castillo Aponte.

159. Yastany explained to PATH intake personnel that Ms. Castillo Aponte was deaf. Maria and Yastany then proceeded to help Ms. Castillo Aponte fill out PATH's intake paperwork. Maria and Yastany then interpreted on Ms. Castillo Aponte's

behalf during a brief meeting with PATH personnel at which Castillo Aponte plaintiffs were assigned to the Frant Hotel in Manhattan.  PATH personnel also asked Ms. Castillo Aponte to return the next day for a follow-up meeting. Castillo Aponte plaintiffs were then transported by van to the Frant Hotel.

160.    Maria and Yastany were 15 years of age and 12 years of age, respectively, at the time of the family's return to PATH.  Neither Maria nor Yastany is a certified ASL interpreter, has formal training in ASL, or is otherwise qualified to perform interpretive services.

161.    City Defendants' staff at PATH knew that Ms. Castillo Aponte was deaf.

162.    City Defendants failed to provide Ms. Castillo Aponte an ASL Interpreter.

163.    Upon learning that there would not be an ASL interpreter at the follow-up meeting at PATH, Ms. Castillo Aponte cancelled it.  PATH personnel eventually made interpreters available at meetings with Ms. Castillo Aponte that took place later that week.  Ms. Castillo Aponte attended those meetings and was able to discuss her medical condition with an interpreter present.

**Castillo Aponte Plaintiffs Arrive at the Frant Hotel**

164.    Upon arriving at the Frant Hotel on or around May 3, 2011, Castillo Aponte Plaintiffs had a meeting with the manager to discuss security and the rules of living in the facility.  Ms. Castillo Aponte had to sign documents in order to secure a room in the facility.  Despite being aware that Ms. Castillo Aponte was deaf, the Frant Hotel's staff did not provide her with an interpreter or take any steps to obtain one on her behalf.

23

165.    As a result, no interpreter was present to explain the contents of the documents or the information regarding security to Ms. Castillo Aponte and she was forced to rely on her children for an explanation.

166.    Upon information and belief, the Frant Hotel staff was on notice of its obligation to provide ASL interpreters to deaf clients before Ms. Castillo Aponte entered the shelter system.

**Castillo Aponte Plaintiffs Denied Access to ASL Interpreters, Despite Repeated Requests**

167.    During Castillo Aponte Plaintiffs' three-year stay at the Frant Hotel they had requested and had been denied ASL interpretive services numerous times.

168.    For example, Ms. Castillo Aponte requested an interpreter at her first bimonthly meeting with a Frant Hotel caseworker, in May 2011.  The case worker denied Ms. Castillo Aponte's request immediately.

169.    Despite her request, there was no interpreter present at Ms. Castillo Aponte's next bimonthly meeting with the caseworker, nor was there an interpreter at any such bimonthly meeting after that until April 2014.

170.    At a meeting later in 2011, Ms. Castillo Aponte requested an interpreter by writing the term "interpreter" on a note and handing it to the caseworker.  However, no interpreter was present two weeks later when Ms. Castillo Aponte went in for her next appointment.

171.    After the caseworker stopped working for the Frant Hotel in October 2011, Ms. Castillo Aponte submitted both oral and written requests for an interpreter to the case worker's successor.  Ms. Castillo Aponte also requested an interpreter from the building manager.  All of Ms. Castillo Aponte's requests were denied.

172.    Maria and Yastany also made several verbal requests for interpreters on behalf of Ms. Castillo Aponte during their stay at the Frant Hotel.  Those requests were denied.

173.    At one point, a member of the staff gave Maria and Yastany a card to call an interpreter.  The staffer did not offer to provide an interpreter or to arrange for the Frant Hotel to pay for one.

174.    On several occasions during Castillo Aponte Plaintiffs' stay at the Frant Hotel, Frant Hotel staff provided Ms. Castillo Aponte with paperwork regarding permanent housing that Ms. Castillo Aponte could not understand without an interpreter present.  As a result of the Frant Hotel's refusal to provide an interpreter, Ms. Castillo Aponte had to travel to a social service agency to have the paperwork translated into ASL.

175.    The Frant Hotel repeatedly denied Castillo Aponte Plaintiffs' requests for an interpreter, despite having a legal obligation to provide one.  As a result, Castillo Aponte Plaintiffs were denied the opportunity to fully participate in, question, or understand discussions and decisions concerning their residence at the Frant Hotel. Furthermore, the Frant Hotel denied Ms. Castillo Aponte the benefit of programs and services available to hearing residents such as meetings with shelter case workers and shelter-wide discussions regarding the availability of public benefits and job opportunities.  The Frant Hotel also denied Ms. Castillo Aponte the ability to voice questions or complaints regarding shelter conditions.

176.    Also as a result of discrimination on the part of City Defendants, Castillo Aponte Plaintiffs have suffered and continue to suffer extreme emotional distress.  City

Defendants' repeated denials of interpretive services have resulted in Castillo Aponte Plaintiffs experiencing overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as they attempted to make their way through the shelter system.

177.    In addition, Ms. Castillo Aponte has suffered and continues to suffer from embarrassment and shame when discussing topics like joblessness, disability benefits, welfare, and her health problems in front of her daughters (as a result of her daughters being asked by Frant Hotel staff to interpret on Ms. Castillo Aponte's behalf during meetings with caseworkers).

**Castillo Aponte Children Have Experienced and Continue to Experience Extreme Emotional Distress**

178.    Castillo Aponte children have been directly harmed by City Defendants' failures to provide ASL interpretive services.

179.    As a result of the City Defendants' refusal to provide Ms. Castillo Aponte with an interpreter, Maria and Yastany had been asked by shelter personnel to interpret on behalf of their mother, causing them to suffer extreme emotional distress and, on several occasions, be pulled out of school or other activities.

180.    Ms. Castillo Aponte had reminded Frant Hotel staff on several occasions that it was not her daughters' responsibility to provide ASL translation services on Ms. Castillo Aponte's behalf.

181.    Castillo Aponte children are not certified ASL interpreters.

**FACTS – PLAINTIFF WALTON SERRANO COLON**

**Mr. Colon Arrives at Bellevue Shelter and is Denied a Sign Language Interpreter**

182.    Plaintiff Walton Colon is deaf.

183.     On or about November 27, 2009 Mr. Colon entered the Bellevue Men's Shelter located at 400 East 30th Street in Manhattan, New York.

184.     On or about November 27, 2009, Mr. Colon requested to staff at the Bellevue Shelter that he be provided with a sign language interpreter.

185.     Mr. Colon met with his case manager at the Bellevue Shelter once every two weeks while he was a resident at the Bellevue Shelter in Manhattan.

186.     Mr. Colon requested to his case manager each time they met, that a sign language interpreter be provided during their meetings together.

187.     Mr. Colon requested in writing to his case manager and staff at the Bellevue Shelter that a sign language interpreter be provided for meetings with his case manager.

188.     Despite repeated requests for a sign language interpreter, the Bellevue Shelter failed to provide Mr. Colon with an interpreter for meetings with his case manager at any time when Mr. Colon was a resident at the Bellevue Shelter.

189.     In addition to requesting an interpreter for meetings with his case manager, Mr. Colon requested that a sign language interpreter be provided for meetings that were held by the New York City Housing Authority on a weekly basis at the Bellevue Shelter.

190.     Mr. Colon made a request to his case manager that a sign language interpreter be provided at the weekly meetings that were held by the New York City Housing Authority at the Bellevue Shelter.

191.     Despite Mr. Colon's requests for a sign language interpreter, the Bellevue Shelter failed to provide Mr. Colon with a sign language interpreter for any of the

meetings held by the New York City Housing Authority at the Bellevue Shelter while Mr. Colon was a resident there.

192. After residing at the Bellevue Shelter in Manhattan for six (6) weeks, Mr. Colon was transferred to another shelter located in Brooklyn, New York.

**Mr. Colon Arrives at Brooklyn Shelter and is Denied a Sign Language Interpreter**

193. On or about January 2010, Mr. Colon was transferred from the Bellevue Shelter to the Brooklyn shelter where he would reside for the next four (4) years.

194. Mr. Colon would meet with his case manager at the shelter in Brooklyn every two weeks, from on or about January 2010 until January 2014.

195. Every two weeks, when Mr. Colon met with his case manager, he would make a new request for an interpreter, or would follow up on his previous request for a sign language interpreter.

196. Mr. Colon's case manager would communicate with Mr. Colon by writing back and forth during their sessions.

197. Mr. Colon's case manager assured him in writing back and forth that a sign language interpreter would be present to interpret for Mr. Colon during subsequent meetings with the case manager.

198. Despite Mr. Colon's requests, Mr. Colon was never provided with a sign language interpreter for any meetings with his case manager from on or about January 2010 through January 2014, while Mr. Colon was a resident in the Brooklyn shelter.

199. Mr. Colon would also make written requests to staff at the Brooklyn shelter asking that a sign language interpreter be provided for general meetings that were held at the shelter.

200.   Despite Mr. Colon's written requests to staff at the Brooklyn shelter, no interpreter was ever provided to Mr. Colon for general meetings at a Brooklyn Shelter while he resided there from on or about January 2010 through on or about January 2014.

**Mr. Colon Arrives at Bowery Resident Community Shelter and is Denied a Sign Language Interpreter During General Meetings**

201.   On or about February 2014 Mr. Colon was transferred to the Bowery Resident Community Shelter ("BRC") located at 127 West 25th Street, New York, New York, where he resided for approximately 2 months.

202.   Mr. Colon met with his case manager every two weeks while he resided at BRC.

203.   Mr. Colon did receive a sign language interpreter for meetings with his case manager during the time he resided at BRC.

204.   Mr. Colon attended general meetings at BRC while he resided there.

205.   BRC failed to provide interpretive services for Mr. Colon for any of the general meetings that were held at the BRC shelter during the two months that he resided there, despite his requests for an American Sign Language interpreter.

**Mr. Colon Arrives at Project Renewal Shelter and is Denied a Sign Language Interpreter**

206.   On or about April 2014, Mr. Colon was transferred to the Project Renewal Shelter located at 4380 Bronx Boulevard, New York 10466.

207.   Beginning on or about April 2014, Mr. Colon began meeting with his case manager at the Project Renewal Shelter every two weeks.

208.    At the first meeting with his case manager in or about April 2014, Mr. Colon expressed in writing, to his case manager, that he was deaf and required a sign language interpreter to communicate.

209.    Mr. Colon's case manager communicated to Mr. Colon by writing back and forth with him, expressing that the case manager would try and obtain a sign language interpreter for Mr. Colon.

210.    Despite Mr. Colon's requests, and his case manager's response to his requests that the case manager would try to obtain an interpreter, Project Renewal Shelter failed to provide Mr. Colon with a sign language interpreter for any of the meetings with his case manager since Mr. Colon moved to the Project Renewal Shelter in the Bronx in or about April 2014.

211.     General meetings are held at the Project Renewal Shelter in the Bronx where Mr. Colon resides.

212.    Mr. Colon was told by staff at the Project Renewal Shelter that they were aware that a sign language interpreter was required and that they were trying to obtain a sign language interpreter for Mr. Colon.

213.    Despite Mr. Colon's requests and the staff's response that they would try and provide an interpreter, Project Renewal Shelter failed to provide Mr. Colon with a sign language interpreter for any of the general meetings held at the Project Renewal Shelter since Mr. Colon moved there in or about April 2014.

214.    Since Mr. Colon moved to the Project Renewal Shelter in or about April 2014, he had not received a sign language interpreter at any time.

**Mr. Colon Has Experienced and Continues to Experience Extreme Emotional Distress**

30

215.    Mr. Colon has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

216.    Mr. Colon experienced and continues to experience emotional distress.

217.    Mr. Colon suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Mr. Colon.

218.    Mr. Colon was unable to communicate with staff about housing opportunities, employment, and other services that he may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelter.

219.    City Defendants' failure to provide interpretive services caused and continues to cause Mr. Colon to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as he has attempted to make his way through the New York City shelter system.

## FACTS – PLAINTIFF YENNY CRUZ

220.    Ms. Cruz is deaf and communicates through American Sign Language.

221.    Ms. Cruz has been a resident in the New York City Shelter System since 2008.

222.    Ms. Cruz arrived at PATH Shelter located at 151 East 151st Street, Bronx NY 10451.

223.    Ms. Cruz did have access to a sign language interpreter at PATH intake Shelter. Ms. Cruz remained at PATH intake Shelter for three (3) days before being transferred to a shelter located in Manhattan, New York.

**Ms. Cruz Arrives at the Manhattan Shelter**

224. In the eleven (11) days that Ms. Cruz resided at the shelter in Manhattan, New York, Ms. Cruz did have access to a sign language interpreter once through a Video Relay Service (VRS).

225. After residing at the Manhattan Shelter for eleven (11) days, Ms. Cruz was transferred to a Queens Shelter located in New York.

**Ms. Cruz Arrives at Queens Shelter**

226. In or about 2008, Ms. Cruz arrived at the Queens Shelter located in New York.

227. Ms. Cruz met with her case manager every two weeks while she resided at the Queens Shelter.

228. For the first six (6) months that Ms. Cruz resided at the Queens Shelter, she had a sign language interpreter present during meetings with her case manager.

229. After the first six (6) months, Ms. Cruz received a sign language interpreter for approximately half of the meetings she had with her case manager.

230. During the meetings Ms. Cruz had with her case manager where no sign language interpreter was present, Ms. Cruz's case manager would communicate with Ms. Cruz by pointing to pictures of signs in a sign language book.

231. Ms. Cruz was unable to effectively communicate with her case manager when no sign language interpreter was present as the case manager's method of trying to communicate with Ms. Cruz by pointing to pictures in a sign language book was ineffective.

232. General meetings were held for residents at the Queens Shelter approximately twice per month.

233.        Ms. Cruz did not have a sign language interpreter present for the general meetings that were held at the Queens shelter twice per month, although she made requests.

**Ms. Cruz Moves to an Apartment**

234.     In or about February 2010, Ms. Cruz moved to an apartment where she remained until or about February 2012 when she vacated the apartment.

**Ms. Cruz Moves to Another Shelter**

235.     On or about February 2012, Ms. Cruz re-entered the New York City shelter system and was placed in a shelter in the Bronx, New York.

236.     Ms. Cruz resided at the shelter for approximately one month.

**Ms. Cruz Moves to the Franklin Women's Shelter**

237.     On or about March 2012, Ms. Cruz was transferred to the Franklin Women's Shelter located at 1122 Franklin Avenue, Bronx, New York, 10456.

238.     Ms. Cruz met with her case manager every two weeks while she was a resident at the Franklin Women's Shelter.

239.     Ms. Cruz had access to a sign language interpreter for approximately half of the meetings she had with her case manager.

240.     At approximately half of the meetings Ms. Cruz had with her case manager, she was unable to effectively communicate with her case manager.

241.     General meetings were held for Shelter residents every two weeks at the Franklin Women's Shelter.

242.    Ms. Cruz was never provided with a sign language interpreter for any of the general meetings that were held at the Franklin Women's Shelter in the time that she resided there, although she made requests for interpreters.

**Ms. Cruz Arrived at another Manhattan Shelter**

243.    In or about April 2012, Ms. Cruz was transferred to another Manhattan Shelter.

**Ms. Cruz Arrives at Another Shelter**

244.    In or about October 2012, Ms. Cruz was transferred to yet another Manhattan shelter.

**Ms. Cruz Arrives at a Bronx Shelter**

245.    In or about January 2013, Ms. Cruz was transferred to a Bronx shelter.

246.    While residing at the Bronx Shelter, Ms. Cruz met with her case manager every two weeks.

247.    Ms. Cruz requested that her case manager provide her with an interpreter for meetings by providing her case manager with a written request explaining that she was deaf and required a sign language interpreter to communicate.

248.    Ms. Cruz provided her case manager with a business card, for the purpose of obtaining an interpreter, containing an email address and written instructions on how to contact a sign language interpreter.

249.    Despite written requests from Ms. Cruz and written instructions on how to obtain a sign language interpreter, no interpreter was ever provided to Ms. Cruz for any of the meetings with her case manager in the time she resided at the Bronx Shelter.

250.    General meetings were held for residents at the Bronx Shelter.

251.    Ms. Cruz requested that a sign language interpreter be provided for general meetings at the Bronx Shelter, by providing the Bronx Shelter office staff with written requests for a sign language interpreter.

252.    Ms. Cruz provided staff at the Bronx Shelter with a business card, for the purpose of obtaining an interpreter, containing an email address and written instructions on how a sign language interpreter may be contacted.

253.    Despite written requests from Ms. Cruz and written instructions on how to obtain a sign language interpreter, no interpreter was ever provided to Ms. Cruz for any of the general meetings that were held for residents in the time she resided at the Bronx Shelter.

**Ms. Cruz Arrives at another Manhattan Shelter**

254.    On or about August 2, 2013 Ms. Cruz was transferred from the Bronx Shelter to another Manhattan Shelter.

255.    Ms. Cruz met with her case manager every two weeks at the Manhattan Shelter.

256.    Despite written requests to her case manager that a sign language interpreter be provided at every meeting, a sign language interpreter had only been provided to Ms. Cruz on limited occasions.

257.    General meetings are held at the Manhattan Shelter for residents.

258.    Manhattan Shelter staff is aware that Ms. Cruz is deaf and communicates using sign language.

259.    Limited sign language interpreters, if any, have been provided to Ms. Cruz for any general meetings after Ms. Cruz began living there on or about August 2, 2013, despite requests by Ms. Cruz for a sign language interpreter.

**Ms. Cruz Has Experienced and Continues to Experience Extreme Emotional Distress**

260.    Ms. Cruz has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

261.    Ms. Cruz experienced and continues to experience emotional distress.

262.    Ms. Cruz suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Cruz.

263.    Ms. Cruz was unable to communicate with staff about housing opportunities, employment, and other services that she may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelter.

264.    Ms. Cruz suffered and continues to suffer extreme emotional distress because Ms. Cruz is unable to communicate with shelter staff or her case manager.

265.    City Defendants' failure to provide interpretive services caused and continues to cause Ms. Cruz to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she has attempted to make her way through the New York City shelter system.

## FACTS – PLAINTIFF MARIA DOMINGUEZ

**Ms. Dominguez Arrives at the Brooklyn Women's Shelter**

266.    Beginning in 2013, Ms. Dominguez sought residence in the New York City shelter system.

267.    Ms. Dominguez was sent to the Brooklyn Women's Shelter located at 116 Williams Avenue, Brooklyn, New York, 11217.

268.    Ms. Dominguez met with her case manager while she resided at the Brooklyn Women's Shelter.

269.    Ms. Dominguez requested a sign language interpreter to communicate.

270.    Despite Ms. Dominguez's requests for an interpreter, the Brooklyn Women's Shelter failed to provide Ms. Dominguez with an interpreter for meetings with her case manager while she resided there.

271.    General meetings were held at the Brooklyn Women's Shelter for the residents.

272.    Ms. Dominguez made a request to staff at the Brooklyn Shelter that a sign language interpreter be provided for the general meetings.

273.    Staff at the Brooklyn Women's Shelter failed to obtain a sign language interpreter for Ms. Dominguez for the general meetings that were held at the Brooklyn Women's Shelter.

**Ms. Dominguez Has Experienced and Continues to Experience Extreme Emotional Distress**

274.    Ms. Dominguez has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

275.    Ms. Dominguez experienced and continues to experience emotional distress.

276.    Ms. Dominguez suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Dominguez.

277.     Ms. Dominguez was unable to communicate with staff about housing opportunities, employment, and other services that she may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelter.

278.     City Defendants' failure to provide interpretive services caused Ms. Dominguez to experience stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she has attempted to make her way through (and ultimately, out of) the New York City shelter system.

## FACTS – PLAINTIFF ISMAEL GARCIA

279.     Ismael Garcia is deaf.

280.     Beginning in 2013, Mr. Garcia arrived at the 30th Street Men's Shelter located at 400-430 East 30th Street, New York, New York, 10016.

281.     Mr. Garcia remained at the 30th Street Men's Shelter for approximately three (3) days before being transferred to an alternative facility.

282.     In the three (3) days that Mr. Garcia resided at the 30th Street Shelter in Manhattan, Mr. Garcia requested to his case manager that a sign language interpreter be provided.

283.     During his stay, Mr. Garcia communicated with his case manager and staff at the 30th Street Men's Shelter for three (3) days by writing back and forth.

284.     Despite Mr. Garcia's written requests for a sign language interpreter, the 30th Street Men's Shelter failed to provide Mr. Garcia with an interpreter during his residency at the Shelter.

285.     Mr. Garcia was taken from the 30th Street Men's Shelter to Bellevue

Hospital, until Mr. Garcia was transferred to the Atlantic Avenue Men's Shelter.

**Mr. Garcia Arrives at the Atlantic Avenue Men's Shelter and Was Denied an ASL Interpreter**

286.     Mr. Garcia arrived at the Atlantic Avenue Men's Shelter located at 1322

Bedford Avenue, Brooklyn, New York, 11216.

287.     Mr. Garcia met with his case manager approximately every 2 weeks while

he was living at the Atlantic Avenue Men's Shelter.

288.     Mr. Garcia communicated his request to his case manager for an ASL

interpreter to communicate.

289.     Despite Mr. Garcia's written request to his case manager for a sign

language interpreter, the Atlantic Avenue Shelter failed to provide Mr. Garcia with a sign

language interpreter for meetings he had with his case manager while he resided there.

290.     General meetings are held for residents at the Atlantic Avenue Men's

Shelter.

291.     Mr. Garcia requested that an interpreter be provided for him during the

general meetings.

292.     Despite written requests from Mr. Garcia, the Atlantic Avenue Men's

Shelter failed to provide Mr. Garcia with a sign language interpreter for meetings held at

the Shelter while Mr. Garcia resided there.

**Mr. Garcia Has Experienced and Continues to Experience Extreme Emotional Distress**

293.     Mr. Garcia has been directly harmed by The City Defendants' failure to

provide ASL interpretive services.

294.    Mr. Garcia experienced and continues to experience emotional distress.

295.    Mr. Garcia suffers from damages as a direct result of City Defendants'

failure to provide a sign language interpreter to Mr. Garcia.

296.    Mr. Garcia was unable to communicate with staff about housing

opportunities, employment, and other services that he may be qualified for as a direct

result of not having a sign language interpreter present at meetings at the City

Defendants' shelter.

297.    City Defendants' failure to provide interpretive services caused Mr. Garcia

to experience stress, fear, frustration, uncertainty, confusion and feelings of helplessness

as he has attempted to make his way through (and ultimately, out of) the New York City

shelter system.

### FACTS – PLAINTIFF SHIRLEY ESPINOSA BOLANOS

298.    Plaintiff Shirley Espinosa Bolanos is deaf and communicates through

American Sign Language.

### Ms. Espinosa Arrives at the Staten Island Shelter

299.    On or about April 7, 2012 Ms. Espinosa entered a New York City Shelter

on Staten Island.

300.    At the shelter, Ms. Espinosa met with her case manager every two weeks.

301.    Ms. Espinosa's case manager knew that Ms. Espinosa was deaf.

302.    Ms. Espinosa provided her case manager with written requests for an

interpreter every two weeks when they met.

303.     Despite Ms. Espinosa's requests, the Staten Island Shelter failed to provide Ms. Espinosa with a sign language interpreter for any of the meetings she had with her case manager during the time she resided there.

304.     General meetings were held for residents at the Staten Island Shelter.

305.     Ms. Espinosa requested in writing to shelter staff that a sign language interpreter be provided for her during these general meetings.

306.     Despite Ms. Espinosa's written requests, the Staten Island Shelter failed to provide Ms. Espinosa with a sign language interpreter for any of the general meetings that were held at the Staten Island Shelter during the time she resided there.

307.     On or about August 13, 2012, staff at the shelter pointed to a document motioning that Ms. Espinosa sign the document.

308.     On or about August 13, 2012, Ms. Espinosa was transferred from the Staten Island Shelter to PATH.

**Ms. Espinosa Arrives at PATH**

309.     On or about August 13, 2012 Ms. Espinosa arrived at PATH, where she remained for one day before being transferred to the Eden Hotel Shelter in the Bronx.

310.     PATH Shelter failed to provide Ms. Espinosa with an interpreter while she resided there, although she requested an interpreter.

**Ms. Espinosa Arrives at the Bronx Shelter**

311.     On or about August 13, 2012, Ms. Espinosa arrived at the Eden Motel Shelter in the Bronx.

312.     At the Eden Motel Shelter, Ms. Espinosa met with her case manager every two weeks.

313.   Ms. Espinosa's case manager knew that Ms. Espinosa was deaf.

314.   Ms. Espinosa provided her case manager with written requests for a sign language interpreter every two weeks when they met.

315.   Despite Ms. Espinosa's repeated written requests to her case manager that a sign language interpreter be provided, the Eden Motel Shelter failed to provide Ms. Espinosa with an interpreter at any of the meetings she had with her case manager while living at the Bronx Shelter.

316.   General meetings were held for residents at the Eden Motel Shelter.

317.   Ms. Espinosa requested in writing to shelter staff that a sign language interpreter be provided for her during these general meetings.

318.   Despite Ms. Espinosa's written requests, the Eden Motel Shelter failed to provide Ms. Espinosa with a sign language interpreter for any of the general meetings that were held at the Bronx Shelter during the time she resided there.

319.   On or about February 11, 2013 Ms. Espinosa was transferred from the Eden Motel Shelter back to a shelter in Staten Island.

**Ms. Espinosa Arrived at Project Hospitality House**

320.   On or about February 11, 2013, Ms. Espinosa arrived at Project Hospitality House, located in Staten Island, NY.

321.   Ms. Espinosa meets with her case manager every two weeks at the Project Hospitality House.

322.   At some, but not all meetings Ms. Espinosa has with her case manager, a sign language interpreter is present.

323.     At the meetings where there is no sign language interpreter provided, Ms. Espinosa makes a request to her case manager that a sign language interpreter be provided at every meeting.

324.     General meetings are held for residents at the Project Hospitality House.

325.     Ms. Espinosa requested in writing to shelter staff that a sign language interpreter be provided for her during these general meetings.

326.     Despite Ms. Espinosa's written request, the Project Hospitality House failed to provide Ms. Espinosa with a sign language interpreter for general meetings that are held at the Staten Island Shelter where she currently resides.

**Ms. Espinosa Has Experienced and Continues to Experience Extreme Emotional Distress**

327.     Ms. Espinosa has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

328.     Ms. Espinosa experienced and continues to experience emotional distress because Ms. Espinosa is unable to communicate with shelter staff while residing in the City Defendants' shelters.

329.     Ms. Espinosa suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Espinosa.

330.     Ms. Espinosa is unable to communicate with staff about housing opportunities, employment, and other services that she may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters.

331.     City Defendants' failure to provide interpretive services caused and continues to cause Ms. Espinosa to experience overwhelming stress, fear, frustration,

uncertainty, confusion and feelings of helplessness as she has attempted to make her way through the New York City shelter system.

## FACTS – GOULBOURNE PLAINTIFFS

332. Alicia and Keith Goulbourne are married.

333. Both Alicia and Keith Goulbourne are deaf and communicate through ASL.

334. Alicia has a minor child.

### The Goulbourne Plaintiffs Arrive at PATH

335. On or about December 16, 2012, Goulbourne Plaintiffs arrived at PATH.

336. Ms. Goulbourne requested an interpreter on behalf of Goulbourne Plaintiffs.

337. Despite Ms. Goulbourne's request that Goulbourne Plaintiffs be provided with a sign language interpreter, the PATH Shelter failed to provide Goulbourne Plaintiffs with an interpreter.

338. On or about December 16, 2012, the staff at PATH sent Goulbourne Plaintiffs to a hotel for the night, indicating that they should return the following day.

339. On or about December 17, 2012, Goulbourne Plaintiffs returned to PATH and an interpreter was present.

### The Goulbourne Plaintiffs Arrive at the Bronx Neighborhood Cluster Shelter

340. On or about December 16, 2012, the Alicia Goulbourne, Keith Goulbourne and Alicia Goulbourne's minor child arrive at the Bronx Neighborhood Cluster Shelter located at 737 East 187th Street, Apartment 6, Bronx, New York.

341.    Ms. Goulbourne met with her case manager every two weeks at the Bronx Neighborhood Cluster Shelter, on behalf of her family, Mr. Goulbourne and her minor child.

342.    Ms. Goulbourne requested on multiple occasions that a sign language interpreter be provided and directed these requests to her case manager at the Bronx Neighborhood Cluster Shelter.

343.    Despite numerous requests that a sign language interpreter be provided for the Goulbourne Plaintiffs, the Bronx Neighborhood Cluster Shelter failed to provide a sign language interpreter for meetings the Goulbourne Plaintiffs had with their case manager since they began residing at the Bronx Neighborhood Cluster Shelter on or about December 16, 2012 until on or about July 2014.

344.    Beginning in or about July 2014, the Bronx Neighborhood Cluster, on occasion, provided an interpreter for meetings with Mr. and Ms. Goulbourne's case manager.

345.    The Goulbourne Plaintiffs were unable to participate in meetings with their case manager because they were unable to communicate effectively without a sign language interpreter, except in those instances where an ASL interpreter is provided.

346.    The Goulbourne's case manager attempted to communicate with the Goulbourne Plaintiffs by writing back and forth during meetings when no interpreter is present.

347.    The Goulbourne Plaintiffs were unable to effectively communicate with their case manager at the Bronx Neighborhood Cluster Shelter by writing notes back and forth during meetings where no interpreter is provided.

**The Bronx Neighborhood Cluster Shelter Fails to Provide Interpreters for General Meetings**

348.    The Bronx Neighborhood Cluster Shelter holds general meetings for residents of the Shelter.

349.    Mr. Goulbourne, Ms. Goulbourne had requested to staff at the Bronx Neighborhood Cluster Shelter on multiple occasions that a sign language interpreter be provided for the general meetings.

350.    When Ms. Goulbourne arrived for this required meeting, no sign language interpreter was provided.

351.    Despite numerous requests to staff at the Bronx Neighborhood Cluster Shelter that a sign language interpreter be provided for general meetings, the Shelter failed to provide the Goulbourne Plaintiffs with an interpreter for general meetings at the Bronx Neighborhood Cluster Shelter since the Goulbourne Plaintiffs began residing there on or about December 16, 2012.

**Goulbourne Plaintiffs Have Experienced and Continue to Experience Extreme Emotional Distress**

352.    Mr. and Ms. Goulbourne have been directly harmed by The City Defendants' failure to provide ASL interpretive services.

353.    Mr. and Ms. Goulbourne experienced and continue to experience emotional distress.

354.    Mr. and Ms. Goulbourne suffer from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Mr. and Ms. Goulbourne.

355.    Mr. and Ms. Goulbourne were unable to communicate with staff about housing opportunities, employment, and other services that they may be qualified for as a

direct result of not having a sign language interpreter present at meetings at the City Defendants' shelter.

356.     The Goulbourne Plaintiffs suffered and continue to suffer extreme emotional distress because Mr. and Ms. Goulbourne were unable to communicate with shelter staff or their case manager about the needs of Ms. Goulbourne's minor child, including issues relating to his health, education while residing in the City Defendants' shelters.

357.     City Defendants' failure to provide interpretive services caused and continues to cause the Goulbourne Plaintiffs to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness.

### FACTS – PLAINTIFF HANIF MOHAMMED

358.     Hanif Mohammed is deaf and communicates by using sign language.

359.     Mr. Mohammed requires a Certified Deaf Interpreter (CDI) in addition to an ASL interpreter to communicate effectively.

### Mr. Mohammed Arrives at the 30th Street Men's Shelter

360.     On or about March 2013, Mr. Mohammed arrived at a shelter located at 400-430 East 30th Street, New York, NY 10016.

361.     Mr. Mohammed requested an interpreter by providing staff at the 30th Street Men's Shelter with a card that included instructions to call an interpreter.

362.     Despite Mr. Mohammed's requests for an interpreter, he never received an interpreter while residing at the 30th Street Men's Shelter in Manhattan.

### Mr. Mohammed Arrives at the Kingsboro Shelter

363.    On or about May 2013, Mr. Mohammed relocated from the 30th Street Men's Shelter to the Kingsboro Shelter located at 681 Clarkson Avenue in Brooklyn, New York 11203.

364.    Mr. Mohammed attends case management meetings at the Kingsboro Shelter.

365.    On multiple occasions, an interpreter has not been present at these meetings and Mr. Mohammed's meetings at the Kingsboro Shelter have been cancelled.

**Mr. Mohammed Has Experienced and Continues to Experience Extreme Emotional Distress**

366.    The Kingsboro Shelter fails to provide Mr. Mohammed with a sign language interpreter at all of his meetings.

367.    Mr. Mohammed has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

368.    Mr. Mohammed experienced and continues to experience emotional distress.

369.    Mr. Mohammed suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Mr. Mohammed.

370.    Mr. Mohammed has been unable to communicate with staff about housing opportunities, employment, and other services that he may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters.

371.    City Defendants' failure to provide interpretive services caused and continues to cause Mr. Mohammed to experience overwhelming stress, fear, frustration,

uncertainty, confusion and feelings of helplessness as he attempts to make his way through the New York City shelter system.

**FACTS – PLAINTIFF YANNA PENA**

372.    Yanna Pena is deaf and communicates using American Sign Language.

373.    Ms. Pena has two minor children, J.P and L.P.

**Ms. Pena and Her Two Minor Children Arrive at the Shelter in Manhattan**

374.    On or about July 20, 2012, Ms. Pena entered a shelter with her two minor children located in upper Manhattan, New York.

375.    During the time Ms. Pena resided at the Shelter, her minor child was sick and was undergoing medical treatment.

376.    Ms. Pena met with her case manager every two weeks while she was residing at the Shelter in upper Manhattan.

377.    Ms. Pena asked her case manager that a sign language interpreter be provided during their meetings by providing her case manager with written requests that an interpreter be provided.

378.    Ms. Pena's minor child, L.P., verbally requested to the case manager that a sign language interpreter be provided for her mother.

379.    An advocate requested that Ms. Pena's case manager provide a sign language interpreter for Ms. Pena during their meetings.

380.    Ms. Pena provided her case manager with a business card containing an email address and written instructions how a sign language interpreter may be provided, which was given to Ms. Pena by her advocate for the purpose of helping Ms. Pena obtain a sign language interpreter.

381.     Despite Ms. Pena's multiple requests, requests by Ms. Pena's minor child, and requests by her advocate, the shelter in Manhattan failed to provide Ms. Pena with a sign language interpreter for  meetings she had with her case manager.

382.     General Meetings were held for residents of the Shelter while Ms. Pena and her two minor children resided there.

383.     On multiple occasions, Ms. Pena requested that the staff provide her with a sign language interpreter for the general meetings.

384.     Ms. Pena asked the staff at the Shelter that an interpreter be provided for the general meetings by providing the staff with written requests.

385.     Ms. Pena's minor child, L.P., requested that Shelter staff provide her mother with a sign language interpreter for the general meetings by making verbal requests.

386.     The advocate requested that staff provide a sign language interpreter to Ms. Pena during general meetings at the Shelter.

387.     Despite Ms. Pena's multiple requests, requests by Ms. Pena's minor child, and requests by her advocate, the Shelter failed to provide Ms. Pena with a sign language interpreter for general meetings that were held at the Shelter while Ms. Pena and her minor children resided there.

388.     As a result, Ms. Pena's minor child, L.P., would sometimes interpret for Ms. Pena at the general meetings.

389.     Ms. Pena requested Shelter Staff that she speak with them about participating in the women's support group, housing, the fire alarms, fire drills, among other issues.

390.     In response to Ms. Pena's request to speak with shelter staff, she was directed to write everything down.

391.     Ms. Pena is limited in her ability to write and thus was unable to effectively communicate with shelter staff about the women's support group, housing, fire alarms, among other issues.

392.     Ms. Pena's minor child would on occasion interpret for Ms. Pena at the Shelter when her minor child was not in school.

393.     The Shelter failed to provide Ms. Pena with any equipment for individuals who are deaf, including an alarm system designed for individuals with hearing loss.

**Ms. Pena and Her Two Minor Children Arrive at a Second Shelter**

394.     On or about December 20, 2012, Ms. Pena and her two minor children are transitioned from the first Shelter to another Shelter.

395.     During the time Ms. Pena resided at the Second Shelter, her minor child was ill and was undergoing medical treatment.

396.     Ms. Pena met with her case manager every two weeks while she was residing at the second Shelter.

397.     Ms. Pena asked her case manager that a sign language interpreter be provided during their meetings by providing her case manager with written requests that an interpreter be provided at the second Shelter.

398.     Ms. Pena's minor child, L.P., verbally requested the case manager provide a sign language interpreter for her mother at the second Shelter.

399.    An advocate for the plaintiff requested that Ms. Pena's case manager provide a sign language interpreter for Ms. Pena during their meetings at the second Shelter.

400.    Ms. Pena provided her case manager with a business card containing an email address and written instructions how a sign language interpreter may be provided, which was given to Ms. Pena's advocate for the purpose of helping Ms. Pena obtain a sign language interpreter.

401.    Despite Ms. Pena's numerous requests, requests by Ms. Pena's minor child, and requests by her advocate, the second Shelter consistently failed to provide Ms. Pena with a sign language interpreter for her case management in the time she resided there from on or about December 20, 2012 until in or about March 2014.

402.    General meetings were held at the second Shelter while Ms. Pena resided there.

403.    Approximately once a week while Ms. Pena was residing at the second Shelter, Ms. Pena would request that a sign language be provided for her during the general meetings.

404.    Ms. Pena asked the staff at the second Shelter that an interpreter be provided for the general meetings by providing the shelter staff with written requests for an interpreter.

405.    Ms. Pena's minor child requested that Shelter staff provide her mother with a sign language interpreter during the general meetings by making a verbal request on behalf of her mother.

406.    The advocate requested to Shelter staff that a sign language interpreter be provided for Ms. Pena during general meetings at the second Shelter.

407.    Ms. Pena provided Shelter staff with a business card containing an email address and written instructions to procure a sign language interpreter, which was given to Ms. Pena by the advocate, for the purpose of helping Ms. Pena obtain a sign language interpreter.

408.    Despite Ms. Pena's multiple requests, requests by Ms. Pena's minor child, and requests by the advocate, the second Shelter failed to provide Ms. Pena with a sign language interpreter for general meetings that were held at the second Shelter while Ms. Pena and her minor children resided there.

**Ms. Pena and Her Minor Children Arrive at PATH**

409.    In or about March, 2014 Ms. Pena and her minor children arrive at the PATH Shelter, where an ASL interpreter was present.

410.    Ms. Pena resided at PATH for one day and then was transferred to shelter located at 1234 Shakespeare Avenue, Bronx, New York, 10452 (the "Shakespeare Shelter").

**Ms. Pena and Her Minor Children Arrive at 1234 Shakespeare Avenue in the Bronx**

411.    Ms. Pena met with her case manager every two weeks at the Shakespeare Shelter where she resided with her two minor children, located at 1234 Shakespeare Avenue.

412.    Ms. Pena asked  her case manager that a sign language interpreter be provided during their meetings by providing her case manager with written requests that an interpreter be provided.

413.    Ms. Pena's minor child, L.P., requested that the case manager provide a sign language interpreter for her mother.

414.    The advocate requested that Ms. Pena's case manager provide a sign language interpreter for Ms. Pena during their meetings.

415.    Ms. Pena provided her case manager with a business card containing an email address and written instructions on how a sign language interpreter may be procured, which was given to Ms. Pena by her advocate, for the purpose of helping Ms. Pena obtain a sign language interpreter.

416.    Despite Ms. Pena's numerous requests, requests by Ms. Pena's minor child, and requests by the advocate, the Shakespeare Shelter located at 1234 Shakespeare Avenue failed to provide Ms. Pena with a sign language interpreter for  meetings she had with her case manager.

417.    Ms. Pena wrote back and forth with her case manager when they meet every two weeks.

418.    General meetings are held for residents at the Shakespeare Shelter.

419.    Ms. Pena requested an interpreter for general meetings when she requested an interpreter for meeting with her case manager when she met with her case manager every two weeks at the Shakespeare Shelter.

420.    Ms. Pena provided written requests to staff that an interpreter be provided for her during general meetings.

421.    Ms. Pena's minor child requested staff provide her mother with a sign language interpreter during the general meetings.

422.    The advocate requested to staff and the case manager that a sign language interpreter be provided for Ms. Pena during general meetings.

423.    Ms. Pena provided her case manager with a business card containing an email address and written instructions on how a sign language interpreter may be procured, which was given to Ms. Pena by the advocate, for the purpose of helping Ms. Pena obtain a sign language interpreter.

424.    Despite Ms. Pena's requests, requests by Ms. Pena's minor child, and requests by the advocate, the Shakespeare Shelter  failed to provide Ms. Pena with a sign language interpreter for any of the general meetings at the Shelter.

**Pena Plaintiffs Have Experienced and Continue to Experience Extreme Emotional Distress**

425.    Ms. Pena has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

426.    Ms. Pena experienced and continues to experience emotional distress.

427.    Ms. Pena suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Pena.

428.    L.P. has been directly harmed by City Defendants' failure to provide interpretive services.

429.    On multiple occasions, L.P. was asked by shelter personnel to interpret on behalf of Ms. Pena, causing her to suffer extreme emotional distress.

430.    Ms. Pena was unable to communicate with staff about housing opportunities, employment, and other services that she may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters.

431.     Ms. Pena and her minor children suffered and continue to suffer extreme emotional distress because Ms. Pena was unable to communicate with shelter staff or her case manager about the needs of Ms. Pena's minor children, including issues relating to their health and education while residing in the City Defendants' shelters.

432.     City Defendants' failure to provide interpretive services caused and continues to cause the Ms. Pena and her minor children to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as they attempted to make their way through the New York City shelter system.

### FACTS – PLAINTIFF DWAYNE TAYLOR

433.     Dwayne Taylor is deaf and communicates using American Sign Language.

### Mr. Taylor Arrives at the 30th Street Men's Shelter

434.     On or about March 26, 2014, Mr. Taylor arrived at the 30th Street Men's Shelter in Manhattan, New York.

435.     Mr. Taylor requested an interpreter by providing Shelter staff with a written request for a sign language interpreter.

436.     Despite Mr. Taylor's written request for an interpreter, no interpreter was provided for Mr. Taylor during the time he resided at the 30th Street Men's Shelter.

### Mr. Taylor Arrives at the BRC Assessment Shelter

437.     On or about March 29, 2014, Mr. Taylor was transferred from the 30th Street Men's Shelter to the BRC Assessment Center Shelter located at 146 Clay Street in Brooklyn, New York 11222.

438.     Mr. Taylor met with his case manager every two weeks while he resided at the BRC Shelter.

439.    Mr. Taylor requested that his case manager provide him with a sign language interpreter during their meetings by providing his case manager with a written request for an interpreter each time they met.

440.    Mr. Taylor met with his case manager approximately four (4) times in the course of his residency at the BRC Shelter.

441.    Despite Mr. Taylor's written request, the BRC Shelter failed to provide Mr. Taylor with a sign language interpreter for any of the meetings he had with his case manager while he resided at BRC.

442.    At one meeting with his case manager, Mr. Taylor brought a friend with him, who is hearing and knows sign language, to interpret during the meeting with his case manager.

443.    General meetings were held for residents while Mr. Taylor resided at BRC.

444.    Mr. Taylor requested in writing, to staff at the BRC Shelter, that he be provided with a sign language interpreter for the general meetings.

445.    Despite Mr. Taylor's written requests to shelter staff that a sign language interpreter be provided during general meetings, Mr. Taylor did not receive a sign language interpreter for any of the general meetings that occurred while he was a resident of the BRC shelter.

### Mr. Taylor Arrives at Bronx Park Avenue Shelter

446.    In or about May 2014, Mr. Taylor transferred from the BRC Shelter to the Bronx Park Avenue Shelter, located art 3339 Park Avenue, Bronx, NY 10456.

447.    Mr. Taylor met with his case manager every two weeks while residing at the Bronx Park Avenue Shelter.

448.    Mr. Taylor requested in writing to his case manager that a sign language interpreter be provided by writing that he was deaf and needed a sign language interpreter to communicate.

449.    Mr. Taylor provided these written requests for a sign language interpreter to his case manager each time they met.

450.    Despite Mr. Taylor's written requests that a sign language interpreter be provided for meetings with his case manager, the Bronx Park Avenue Shelter failed to provide Mr. Taylor with a sign language interpreter for any of the meetings he had with his case manager during the time he resided at the Bronx Park Avenue Shelter.

451.    At one meeting with his case manager at Bronx Park Avenue, Mr. Taylor brought his friend with him, who is hearing and knows sign language, to interpret during the meeting with his case manager.

452.    General meetings were held for residents while Mr. Taylor resided at Bronx Park Avenue Shelter.

453.    Mr. Taylor requested that an interpreter be provided for general meetings by giving staff at Bronx Park Avenue Shelter written requests, asking that an interpreter be provided during the general meetings.

454.    Despite Mr. Taylor's written requests to staff at the Bronx Park Avenue Shelter, no interpreter was provided to Mr. Taylor for general meetings during the time he resided at the Bronx Park Avenue Shelter.

**Mr. Taylor Has Experienced and Continues to Experience Extreme Emotional Distress**

455.    Mr. Taylor has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

456.    Mr. Taylor experienced and continues to experience emotional distress. Mr. Taylor suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Mr. Taylor. Mr. Taylor was unable to communicate with staff about housing opportunities, employment, and other services that he may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters. City Defendants' failure to provide interpretive services caused Mr. Taylor to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as he attempted to make his way through (and ultimately out of) the New York City shelter system.

### FACTS – PLAINTIFF ESTHER HAZEL

457.    Esther Hazel is deaf and communicates using American Sign Language.

### Ms. Hazel Arrives at the Hopper Home Shelter in Manhattan

458.    On or about December, 2014, Ms. Hazel, who had been residing at the Franklin Women's Shelter, was transferred to the Hopper Home Shelter.

459.    Ms. Hazel met with her case manager while she resided at the Hopper Home Shelter.

460.    Ms. Hazel requested that her case manager provide her with a sign language interpreter during their meetings by providing her case manager with a written request for an interpreter.

461.    Despite Ms. Hazel's written request, the Hopper Home Shelter failed to provide Ms. Hazel with a sign language interpreter for meetings she had with her case manager while she resided at the Hopper Home Shelter.

462.    General meetings were held for residents while Ms. Hazel resided at Hopper Home Shelter.

463.    Ms. Hazel requested in writing, to staff at the Hopper Home Shelter, that she be provided with a sign language interpreter for the general meetings.

464.    Despite Ms. Hazel written requests to shelter staff that a sign language interpreter be provided during general meetings, Ms. Hazel did not receive a sign language interpreter for general meetings that occurred while she was a resident of the Hopper Home Shelter.

465.    Ms. Hazel transferred from Hopper Home Shelter to a another shelter in Jamaica, New York in 2016 and thereafter Ms. Hazel secured permanent housing outside of the shelter system.

**Ms. Hazel Has Experienced Extreme Emotional Distress**

466.    Ms. Hazel has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

467.    Ms. Hazel experienced and continues to experience emotional distress.

468.    Ms. Hazel suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Hazel. Ms. Hazel was unable to communicate with staff about housing opportunities, employment, and other services that she may have been qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters. City Defendants' failure

to provide interpretive services caused Ms. Hazel to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she attempted to make his way through (and ultimately out of) the New York City shelter system.

## FACTS – PLAINTIFF ELIZABETH DONEGAN

### Ms. Donegan Arrives at the Bellevue Shelter

469. In the spring of 2015, Ms. Donegan arrived at the Bellevue Shelter in Manhattan, New York.

470. Ms. Donegan requested an interpreter by providing Shelter staff with a written request for a sign language interpreter.

471. Despite Ms. Donegan's written request for an interpreter, no interpreter was provided to Ms. Donegan during the time she resided at the Bellevue Shelter.

### Ms. Donegan Arrives at Family Shelter in Jamaica

472. In or about May, 2015, Ms. Donegan, who had been residing at the Bellevue, was transferred to a shelter located in Jamaica, New York and resided there until June, 2015.

473. Ms. Donegan met with her case manager while she resided at the Jamaica shelter.

474. Ms. Donegan requested that her case manager provide her with a sign language interpreter during their meetings by providing her case manager with a written request for an interpreter.

475. Despite Ms. Donegan's written request, the shelter failed to provide Ms. Donegan with a sign language interpreter for meetings she had with her case manager while she resided at the shelter.

## Ms. Donegan Arrives at Beach Residence in Queens

476.   In or about June, 2015, Ms. Donegan, who had been residing at the Jamaica shelter, was transferred to another shelter located in Queens, New York known as Beach Residence and resides there presently.

477.   Ms. Donegan meets with her case manager while she resided at the Beach Residence shelter.

478.   Ms. Donegan requests that her case manager provide her with a sign language interpreter during their meetings by providing her case manager with a written request for an interpreter.

479.   Despite Ms. Donegan's written requests, the shelter has failed to provide Ms. Donegan with a sign language interpreter for many of the meetings she had with her case manager while residing at the shelter.

480.   Ms. Donegan's daughter, furthermore, requests that ASL interpreters be provided for her mother at the shelter, but ASL interpreters have been provided only on a limited basis, and not for many meetings that have been held between staff and Ms. Donegan.

## Ms. Donegan Has Experienced Extreme Emotional Distress

481.   Ms. Donegan has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

482.   Ms. Donegan experienced and continues to experience emotional distress.

483.   Ms. Donegan suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Donegan. Ms. Donegan is unable to communicate with staff about housing opportunities, employment, and other services that

she may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters. City Defendants' failure to provide interpretive services causes Ms. Donegan to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she attempts to make her way through (and ultimately out of) the New York City shelter system.

### FACTS – PLAINTIFF MARIE GREGOIRE

484.    Marie Gregoire is deaf and communicates using American Sign Language.

485.    On or about November, 2014, Ms. Gregoire entered the DHS shelter system.

486.    Ms. Gregoire resided at many residences within the DHS shelter system, including the WIN Shelter and Bronx Acacia Cluster 11 that Ms. Gregoire entered in or about December, 2014. .

487.    While at Bronx Acacia Cluster 11, Ms. Gregoire requested an interpreter by providing Shelter staff with a written request for a sign language interpreter.

488.    Despite Ms. Gregoire's written request for an interpreter, interpreters were not provided to Ms. Gregoire during the time she resided at the Bronx Acacia Shelter from in or about December, 2014 until in or about August, 2015.

489.    Ms. Gregoire met with her case manager while she resided at the Bronx shelter.

490.    Ms. Gregoire requested that her case manager provide her with a sign language interpreter during their meetings by providing her case manager with a written request for an interpreter.

491.    Despite Ms. Gregoire's written request, the shelter failed to provide Ms. Gregoire with a sign language interpreter for meetings she had with her case manager while she resided at the shelter.

**Ms. Gregoire Has Experienced Extreme Emotional Distress**

492.    Ms. Gregoire has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

493.    Ms. Gregoire experienced and continues to experience emotional distress.

494.    Ms. Gregoire suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Gregoire. Ms. Gregoire was unable to communicate with staff about housing opportunities, employment, and other services that she may have been qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters. City Defendants' failure to provide interpretive services caused Ms. Gregoire to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she attempted to make his way through (and ultimately out of) the New York City shelter system.

**FACTS – PLAINTIFF JESUS RAMOS**

495.    Jesus Ramos is deaf and communicates using American Sign Language.

**Mr. Ramos Arrives at the 30th Street Men's Shelter**

496.    On or about March, 2015, Mr. Ramos arrived at the 30th Street Men's Shelter in Manhattan, New York.

497.    Mr. Ramos requested an interpreter by providing Shelter staff with a written request for a sign language interpreter.

498.    Despite Mr. Ramos's written request for an interpreter, no interpreter was provided for Mr. Ramos during the time he resided at the 30th Street Men's Shelter.

**Mr. Ramos Arrives at the Wards Island Shelter**

499.    On or about March 23, 2015, Mr. Ramos was transferred from the 30th Street Men's Shelter to the Wards Island Shelter.

500.    Mr. Ramos met with his case manager every two weeks while he resided at the shelter.

501.    Mr. Ramos requested that his case manager provide him with a sign language interpreter during their meetings by providing his case manager with a written request for an interpreter.

502.    Despite Mr. Ramos's written request, the Wards Island Shelter failed to provide Mr. Ramos with a sign language interpreter for any of the meetings he had with his case manager while he resided there.

503.    General meetings were held for residents while Mr. Ramos resided at the shelter.

504.    Mr. Ramos requested in writing, to staff at the shelter, that he be provided with a sign language interpreter for the general meetings.

505.    Despite Mr. Ramos' written requests to shelter staff that a sign language interpreter be provided during general meetings, Mr. Ramos did not receive a sign language interpreter for the general meetings that occurred while he was a resident of the shelter.

**Mr. Ramos Arrives at Bronx Shelter**

506.    In or about June 2015, Mr. Ramos transferred from the Wards Island Shelter to the Bronx Park Avenue Shelter, located art 3339 Park Avenue, Bronx, NY 10456.

507.     Mr. Ramos met with his case manager while residing at the Bronx Park Avenue Shelter.

508.     Mr. Ramos requested in writing to his case manager that a sign language interpreter be provided by writing that he was deaf and needed a sign language interpreter to communicate.

509.     Mr. Ramos provided these written requests for a sign language interpreter to his case manager each time they met.

510.     Despite Mr. Ramos' written requests that a sign language interpreter be provided for meetings with his case manager, the Bronx Park Avenue Shelter failed to provide Mr. Ramos with a sign language interpreter for any of the meetings he had with his case manager during the time he resided at the Bronx Park Avenue Shelter.

511.     General meetings were held for residents while Mr. Ramos resided at Bronx Park Avenue Shelter.

512.     Mr. Ramos requested that an interpreter be provided for general meetings by giving staff at Bronx Park Avenue Shelter written requests, asking that an interpreter be provided during the general meetings.

513.     Despite Mr. Ramos' written requests to staff at the Bronx Park Avenue Shelter, interpreters were not provided to Mr. Ramos for general meetings during the time he resided at the Bronx Park Avenue Shelter.

**Mr. Ramos Has Experienced and Continues to Experience Extreme Emotional Distress**

514.     Mr. Ramos has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

515.     Mr. Ramos experienced and continues to experience emotional distress.

516. Mr. Ramos suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Mr. Ramos. Mr. Ramos was unable to communicate with staff about housing opportunities, employment, and other services that he may be qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters.

517. City Defendants' failure to provide interpretive services caused Mr. Ramos to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as he attempted to make his way through (and ultimately out of) the New York City shelter system.

## FACTS – PLAINTIFF FILIPPO GIAMBIANCO

518. Filippo Giambianco is deaf and communicates using American Sign Language.

### Mr. Giambianco Arrives at the 30th Street Men's Shelter

519. On or about 2014, Mr. Giambianco arrived at the 30th Street Men's Shelter in Manhattan, New York. He was then transferred to BRC Assessment Shelter.

### Mr. Giambianco Arrives at the BRC Shelter

520. On or about 2014, Mr. Giambianco was transferred from the 30th Street Men's Shelter to the BRC Shelter.

521. Mr. Giambianco met with his case manager while he resided at the BRC Shelter.

522. Mr. Giambianco requested that his case manager provide him with a sign language interpreter during their meetings by providing his case manager with a written request for an interpreter each time they met.

523.     Despite Mr. Giambianco's written request, the BRC Shelter failed to provide Mr. Giambianco with a sign language interpreter for any of the meetings he had with his case manager while he resided at BRC.

524.     General meetings were held for residents while Mr. Giambianco resided at BRC.

525.     Mr. Giambianco requested in writing, to staff at the BRC Shelter, that he be provided with a sign language interpreter for the general meetings.

526.     Despite Mr. Giambianco's written requests to shelter staff that a sign language interpreter be provided during general meetings, Mr. Giambianco did not receive a sign language interpreter for general meetings that occurred while he was a resident of the BRC shelter.

### Mr. Giambianco Arrives at BronxWorks Shelter

527.     Mr. Giambianco transferred from the BRC Shelter to the BronxWorks Shelter.

528.     Mr. Giambianco met with his case manager while residing at the BronxWorks Shelter.

529.     Mr. Giambianco requested in writing to his case manager that a sign language interpreter be provided by writing that he was deaf and needed a sign language interpreter to communicate..

530.     Despite Mr. Giambianco's written requests that a sign language interpreter be provided for meetings with his case manager, the BronxWorks Shelter failed to provide Mr. Giambianco with a sign language interpreter for meetings he had with his case manager during the time he resided at the BronxWorks Shelter.

531.    General meetings were held for residents while Mr. Giambianco resided at BronxWorks Shelter.

532.    Mr. Giambianco requested that an interpreter be provided for general meetings by giving staff at BronxWorks Shelter written requests, asking that an interpreter be provided during the general meetings.

533.    Despite Mr. Giambianco's written requests to staff at the BronxWorks Shelter, interpreters were not provided to Mr. Giambianco for general meetings during the time he resided at the BronxWorks Shelter.

534.    Following his stay at the BronxWorks Shelter, Mr. Giambianco was transferred to another shelter and from this shelter Mr. Giambianco transferred to permanent housing outside of the shelter system.

**Mr. Giambianco Has Experienced and Continues to Experience Extreme Emotional Distress**

535.    Mr. Giambianco has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

536.    Mr. Giambianco experienced and continues to experience emotional distress.

537.    Mr. Giambianco suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Mr. Giambianco. Mr. Giambianco was unable to communicate with staff about housing opportunities, employment, and other services that he may have been qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters.

City Defendants' failure to provide interpretive services caused Mr. Giambianco to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as he attempted to make his way through (and ultimately out of) the New York City shelter system.

### FACTS-PLAINTIFF JULIE LOPEZ

538.    Julie Lopez is deaf and communicates using American Sign Language.

### Ms. Lopez Arrives at PATH

539.    On or about December, 2015, Ms. Lopez arrived at the PATH Shelter in Bronx, New York.

540.    Ms. Lopez requested an interpreter by providing Shelter staff with a written request for a sign language interpreter. No interpreter was provided until the following morning.

### Ms. Lopez Arrives at Bronx Shelter

541.    From PATH, Ms. Lopez was transferred to a shelter located in the Bronx, New York, along with her three minor children.

542.    Ms. Lopez met with her case manager while she resided at the Bronx shelter.

543.    Ms. Lopez requested that her case manager provide her with a sign language interpreter during their meetings by providing her case manager with a written request for an interpreter.

544.    Despite Ms. Lopez 's written requests, the shelter has failed on numerous occasions to provide Ms. Lopez with a sign language interpreter for meetings she has had with her case manager while she resides at the shelter.

### Ms. Lopez Has Experienced Extreme Emotional Distress

545.    Ms. Lopez has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

546.    Ms. Lopez experienced and continues to experience emotional distress.

547.    Ms. Lopez suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Lopez. Ms. Lopez was unable to communicate with staff about housing opportunities, employment, and other services that she may have been qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters. City Defendants' failure to provide interpretive services causes Ms. Lopez to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she attempts to make her way through (and ultimately out of) the New York City shelter system.

### FACTS-PLAINTIFF DEMIKA HUNTER

548.    Demika Hunter is deaf and communicates using American Sign Language.

### Ms. Hunter Arrives at the Bellevue Shelter

549.    On or about July, 2016, Ms. Hunter arrived at the Bellevue Shelter in Manhattan, New York.

550.    Ms. Hunter requested an interpreter by providing Shelter staff with a written request for a sign language interpreter.

551.    Despite Ms. Hunter's written request for an interpreter, no interpreter was provided to Ms. Hunter, except on one occasion, during the time she resided at the Bellevue Shelter.

### Ms. Hunter Arrives at Bronx Shelter

552.    Later in the summer of 2016, Ms. Hunter, who had been residing at Bellevue, was transferred to a shelter located at 1397 Stebbins Avenue in the Bronx, New York.

553.    Ms. Hunter met with her case manager while she resided at the Bronx shelter.

554.    Ms. Hunter requested that her case manager provide her with a sign language interpreter during their meetings by providing her case manager with a written request for an interpreter.

555.    Despite Ms. Hunter's written request, the shelter failed to provide Ms. Hunter with a sign language interpreter for meetings she had with her case manager while she resided at the shelter.

**Ms. Hunter Has Experienced Extreme Emotional Distress**

556.    Ms. Hunter has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

557.    Ms. Hunter experienced and continues to experience emotional distress.

558.    Ms. Hunter suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Hunter. Ms. Hunter was unable to communicate with staff about housing opportunities, employment, and other services that she may have been qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters. City Defendants' failure to provide interpretive services caused Ms. Hunter to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she attempted to make his way through (and ultimately out of) the New York City shelter system.

## FACTS-PLAINTIFF JASMINE JOHNSON

559.    Jasmine Johnson is deaf and communicates using American Sign

Language.

### Ms. Johnson Arrives at the Bellevue Shelter

560.    On or about July, 2016, Ms. Johnson arrived at the Bellevue Shelter in

Manhattan, New York.

561.    Ms. Johnson requested an interpreter by providing Shelter staff with a

written request for a sign language interpreter.

562.    Despite Ms. Johnson's written request for an interpreter, no interpreter

was provided to Ms. Johnson, except on one occasion, during the time she resided at the

Bellevue Shelter.

### Ms. Johnson Arrives at Bronx Shelter

563.    Later in the summer of 2016, Ms. Johnson, who had been residing at

Bellevue, was transferred to a shelter located at 1397 Stebbins Avenue in the Bronx, New

York.

564.    Ms. Johnson met with her case manager while she resided at the Bronx

shelter.

565.    Ms. Johnson requested that her case manager provide her with a sign

language interpreter during their meetings by providing her case manager with a written

request for an interpreter.

566.    Despite Ms. Johnson's written request, the shelter failed to provide Ms.

Johnson with a sign language interpreter for meetings she had with her case manager

while she resided at the shelter.

**Ms. Johnson Has Experienced Extreme Emotional Distress**

567.     Ms. Johnson has been directly harmed by The City Defendants' failure to provide ASL interpretive services.

568.     Ms. Johnson experienced and continues to experience emotional distress.

569.     Ms. Johnson suffers from damages as a direct result of City Defendants' failure to provide a sign language interpreter to Ms. Johnson. Ms. Johnson was unable to communicate with staff about housing opportunities, employment, and other services that she may have been qualified for as a direct result of not having a sign language interpreter present at meetings at the City Defendants' shelters. City Defendants' failure to provide interpretive services caused Ms. Johnson to experience overwhelming stress, fear, frustration, uncertainty, confusion and feelings of helplessness as she attempted to make his way through (and ultimately out of) the New York City shelter system.

## FIRST CLAIM FOR RELIEF

### Discrimination on the Basis of a Disability in
### Violation of the Rehabilitation Act
### (29 U.S.C. § 794 et seq.)

570. Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

571. The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

572. At all times relevant to this action, the Rehabilitation Act, 29 U.S.C. § 794 et seq., was in full force and effect and applied to Defendants' conduct.

573. Plaintiff Karla Armenta is a qualified individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

574. Plaintiff Russell Brim is a qualified individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

575. Plaintiff Asher Brim and I.B. Brim are qualified individuals because they are persons known to have a relationship with Ms. Russell Brim, as they were repeatedly identified to City Defendants as Mr. Russell Brim's two children while living in the shelter system. 42 U.S.C. § 12182(b)(1)(E).

576. Plaintiff Tamara Castillo Aponte is a qualified individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

577. Plaintiffs Maria Magdelena Astacio Castillo and Yastany Astacio are qualified individuals because they are persons known to have a relationship with Ms. Castillo Aponte, as they were repeatedly identified to City Defendants as Ms. Castillo Aponte's two children beginning in May 2011. 42 U.S.C. § 12182(b)(1)(E).

578. Plaintiff Walton Serrano-Colon is a qualified individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

579. Plaintiff Yenny Cruz is a qualified individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

580. Plaintiff Maria Dominguez is a qualified individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

581. Plaintiff Shirley Espinosa is a qualified individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

582. Plaintiff Ismael Garcia is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

583. Plaintiffs Keith Goulbourne and Alicia Goulbourne are qualified individuals with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

584. Plaintiff Hanif Mohammed is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

585. Plaintiff Yaana Pena is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

586. Plaintiff L.P. is a qualified individual because she is a person known to have a relationship with Ms. Yaana Pena, as she was repeatedly identified to City Defendants as Ms. Pena's child while living in the shelter system.  42 U.S.C. § 12182(b)(1)(E).

587. Plaintiff Yunissa Soto is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

588. Plaintiff Dwayne Taylor is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

589. Plaintiff Esther Hazel is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

590. Plaintiff Elizabeth Donegan is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

591. Plaintiff Marie Gregoire is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

592. Plaintiff Jesus Ramos is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

593. Plaintiff Filippo Giambianco is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

594. Plaintiff Julie Lopez is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

595. Plaintiff Demika Hunter is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

596. Plaintiff Jasmine Johnson is a qualified individual with a disability within the meaning of the Rehabilitation Act.  29 U.S.C. § 705(9)(B); 42 U.S.C. 12102.

597. The operations of DHS, including PATH, are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(3)(A)(ii).

598. Defendants receive federal financial assistance within the meaning of the Rehabilitation Act.  29 U.S.C. § 794(a).

599. The Department of Health and Human Services regulations implementing the Rehabilitation Act clarify the requirements for Federal financial recipients, such as Defendants, stating that "[a] recipient . . . that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory ... or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question."  45 C.F.R § 84.52(d)(1).

600. Appropriate auxiliary aids include, but are not limited to, interpreters.  45 C.F.R. § 84.52(d)(3).

601. Defendants have failed, and continue to fail, to comply with the Rehabilitation Act by refusing to provide to deaf and hard of hearing individuals, including Ms. Armenta, Mr. Brim, Ms. Castillo Aponte, Mr. Serrano-Colon, Ms. Cruz, Ms. Dominguez, Ms. Espinosa, Mr. Garcia, Mr. Goulbourne, Ms. Goulbourne, Mr. Mohammed, Ms. Pena, Ms. Soto, Mr. Taylor, Ms. Hazel, Ms. Donegan, Ms. Gregoire, Mr. Ramos, Mr. Giambianco, Ms. Lopez, Ms. Hunter and Ms. Johnson, or on their behalf:

- qualified interpreters;
- auxiliary aids and services;
- displays in each shelter and housing facility indicating availability of ASL interpreters;
- modification of shelter and housing facility forms to ensure ability of individuals to designate ASL as their primary language;
- training for DHS and other personnel regarding the methods of communication employed by the deaf and hard of hearing, and how to ensure effective communications in its shelters and housing facilities;
- provision/designation of an interpreter-ADA accessibility coordinator in each shelter and housing facility who would evaluate the needs of any deaf or hard of hearing individuals;
- changes in policy and procedure to ensure compliance with the law;
- implementation of means of monitoring and reporting non-compliance with the law.

602. The above are examples of techniques employed by other shelters to provide access to services, programs, benefits, activities and facilities for deaf and hard of hearing people in a manner consistent with the Rehabilitation Act and the ADA.

603. Defendants, despite consistent and repeated requests by Plaintiffs, systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

604. Defendants, despite consistent and repeated requests by Plaintiffs, refused to provide sign language interpreters during Ms. Armenta's, Mr. Brim's, Mr. Serrano-Colon's, Ms. Cruz's, Ms. Dominguez's, Ms. Espinosa's, Goulbourne Plaintiffs', Mr. Mohammed's, Pena Plaintiffs', Ms. Soto's, Mr. Taylor's, Ms. Hazel's, Ms. Donegan's, Ms. Gregoire's, Mr. Ramos', Mr. Giambianco's, Ms. Lopez's, Ms. Hunter's and Ms. Johnson's prolonged stays at Defendants' homeless shelters and housing facilities.

### MS. KARLA ARMENTA

605. Ms. Armenta requested an interpreter during her visit to PATH.

606. Ms. Armenta made subsequent requests for interpreters at the Franklin Shelter and the Samaritan Village Shelter.

607. Ms. Armenta's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to Ms. Armenta's stay in PATH, the Franklin Shelter and the Samaritan Village Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted Ms. Armenta, and which were provided to other shelter residents.

608. As a proximate result of City Defendants' violations of Ms. Armenta's rights under the Rehabilitation Act, Ms. Armenta has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

609. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Armenta.

610. As a result of City Defendants' breaches of law, Ms. Armenta has been damaged and injured and demands compensatory damages.

## BRIM PLANTIFFS

611. Mr. Brim requested Communication Access Real-time Translation ("CART") during Brim Plantiffs' stay at the Catherine Street Shelter, Urban Family Center Shelter, the Tov-Hotel Bronx Shelter, and the Freedom House Shelter.

612. Mr. Brim's ability to communicate with City Defendants' shelter staff was significantly impaired, and he was excluded from discussions and decisions relating to Brim Plantiffs' stay in the Catherine Street Shelter, Urban Family Center Shelter, the Tov-Hotel Bronx Shelter, and the Freedom House Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted each of the Brim Plaintiffs, and which were provided to other shelter residents.

613. Plaintiffs Asher Brim and I.B. are also "person[s] aggrieved" within the meaning of the Rehabilitation Act.  29 U.S.C. § 794a(a)(2).  They have each suffered independent injuries causally related to City Defendants' denial of federally required services to Mr. Brim.

614. As a proximate result of City Defendants' violations of Mr. Brim's rights under the Rehabilitation Act, Brim Plaintiffs have suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

615. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Brim Plaintiffs.

616. As a result of City Defendants' breaches of law, Brim Plaintiffs have been damaged and injured and demand compensatory damages.

## CASTILLO APONTE PLAINTIFFS

617. Castillo Aponte Plaintiffs requested an interpreter during both of their visits to PATH.

618. Castillo Aponte Plaintiffs made subsequent requests for interpreters at the Frant Hotel.

619. Ms. Castillo Aponte's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to Castillo Aponte Plaintiffs' stay in the Frant Hotel, applications for permanent housing and other services and benefits, which would have directly benefitted each of the Castillo Aponte Plaintiffs, and which were provided to other shelter residents.

620. Plaintiffs Maria and Yastany are also "person[s] aggrieved" within the meaning of the Rehabilitation Act.  29 U.S.C. § 794a(a)(2).  They have each suffered independent injuries causally related to City Defendants' denial of federally required services to Ms. Castillo Aponte.

621. As a proximate result of City Defendants' violations of Ms. Castillo Aponte's rights under the Rehabilitation Act, Castillo Aponte Plaintiffs have suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

622. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Castillo Aponte Plaintiffs.

623. As a result of City Defendants' breaches of law, Castillo Aponte Plaintiffs have been damaged and injured and demand compensatory damages.

## MR. WALTON COLON

624. Mr. Colon requested an interpreter during his stay at the Bellevue Men's Shelter.

625. Mr. Colon made subsequent requests for interpreters at a Shelter in Brooklyn, the Bowery Resident Community Shelter ("BRC") and the Project Renewal Shelter.

626. Mr. Colon's ability to communicate with City Defendants' shelter staff was significantly impaired, and he was excluded from discussions and decisions relating to Mr. Colon's stay in the Bellevue Men's Shelter, the Shelter in Brooklyn, the Bowery Resident Community Shelter ("BRC") and the Project Renewal Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted Mr. Colon, and which were provided to other shelter residents.

627. As a proximate result of City Defendants' violations of Mr. Colon's rights under the Rehabilitation Act, Mr. Colon has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

628. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Mr. Colon.

629. As a result of City Defendants' breaches of law, Mr. Colon has been damaged and injured and demands compensatory damages and injunctive relief consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

## MS. YENNY CRUZ

630. Ms. Cruz requested an interpreter during her stay at PATH.

631. Ms. Cruz made subsequent requests for interpreters at a shelter in Manhattan, a shelter in Queens, the Living Room Shelter, the Franklin Women's Shelter, Project Renewal, another shelter and the WIN West Shelter.

632. Ms. Cruz's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to Cruz Plaintiffs' stay at the shelters, applications for permanent housing and other services and benefits, which would have directly benefitted Ms. Cruz, and which were provided to other shelter residents.

633. As a proximate result of City Defendants' violations of Ms. Cruz's rights under the Rehabilitation Act, Ms. Cruz has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

634. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Cruz.

635. As a result of City Defendants' breaches of law, Ms. Cruz has been damaged and injured and demands compensatory damages and injunctive relief consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

## MS. MARIA DOMINGUEZ

636. Ms. Dominguez first requested an interpreter during her stay at the Franklin Women's Shelter.

637. Ms. Dominguez made subsequent requests for interpreters at the Brooklyn Women's Shelter.

638. Ms. Dominguez's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to Ms. Dominguez's stay in the Franklin Women's Shelter and Brooklyn Women's Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted Ms. Dominguez, and which were provided to other shelter residents.

639. As a proximate result of City Defendants' violations of Ms. Dominguez's rights under the Rehabilitation Act, Ms. Dominguez has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

640. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Dominguez.

641. As a result of City Defendants' breaches of law, Ms. Dominguez has been damaged and injured and demands compensatory damages.

**MS. ESPINOSA**

642. Ms. Espinosa first requested an interpreter at the shelter on Staten Island.

643. Ms. Espinosa made subsequent requests for interpreters at PATH, Eden Motel Bronx Shelter and Project Hospitality House.

644. Ms. Espinosa's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to Ms. Espinosa's stay at the shelter on Staten Island, PATH, Eden Motel Shelter and Project Hospitality House, applications for permanent housing and other services and

benefits, which would have directly benefitted Ms. Espinosa, and which were provided to other shelter residents.

645. As a proximate result of City Defendants' violations of Ms. Espinosa's rights under the Rehabilitation Act, Ms. Espinosa has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

646. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Espinosa.

647. As a result of City Defendants' breaches of law, Ms. Espinosa has been damaged and injured and demands compensatory damages and injunctive relief consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

## MR. GARCIA

648. Mr. Garcia first requested an interpreter at the 30th Street Men's Shelter.

649. Mr. Garcia made subsequent requests for interpreters at the Atlantic Avenue Men's Shelter.

650. Mr. Garcia's ability to communicate with City Defendants' shelter staff was significantly impaired, and he was excluded from discussions and decisions relating to Mr. Garcia's stay in at the 30th Street Men's Shelter, the Atlantic Avenue Men's Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted Mr. Garcia, and which were provided to other shelter residents.

651. As a proximate result of City Defendants' violations of Mr. Garcia's rights under the Rehabilitation Act, Mr. Garcia has suffered discrimination, unequal treatment,

exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

652. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Mr. Garcia.

653. As a result of City Defendants' breaches of law, Mr. Garcia has been damaged and injured and demands compensatory damages.

## GOULBOURNE PLAINTIFFS

654. Mr. Goulbourne and Mrs. Goulbourne first requested an interpreter at PATH.

655. Mr. Goulbourne and Mrs. Goulbourne made subsequent requests for interpreters at the Bronx Neighborhood Center.

656. Mr. Goulbourne and Mrs. Goulbourne's ability to communicate with City Defendants' shelter staff was significantly impaired, and they were excluded from discussions and decisions relating to Pena Plaintiffs' stay in PATH, the Bronx Neighborhood Center, applications for permanent housing and other services and benefits, which would have directly benefitted each of the Goulbourne Plaintiffs, and which were provided to other shelter residents.

657. As a proximate result of City Defendants' violations of Mr. Goulbourne and Mrs. Goulbourne's rights under the Rehabilitation Act, Goulbourne Plaintiffs have suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

658. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Goulbourne Plaintiffs.

659. As a result of City Defendants' breaches of law, Goulbourne Plaintiffs have been damaged and injured and demand compensatory damages.

## MR. MOHAMMED

660. Mr. Mohammed first requested an interpreter at the 30th Street Men's Shelter.

661. Mr. Mohammed made subsequent requests for interpreters at the Kingsborough Shelter.

662. Mr. Mohammed's ability to communicate with City Defendants' shelter staff was significantly impaired, and he was excluded from discussions and decisions relating to his stay in at the 30th Street Men's Shelter, the Kingsboro Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted Mr. Mohammed, and which were provided to other shelter residents.

663. As a proximate result of City Defendants' violations of Mr. Mohammed's rights under the Rehabilitation Act, Mr. Mohammed has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

664. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Mr. Mohammed.

665. As a result of City Defendants' breaches of law, Mr. Mohammed has been damaged and injured and demands compensatory damages and injunctive relief

consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

## **PENA PLAINTIFFS**

666. Ms. Pena first requested an interpreter at a shelter in Manhattan.

667. Ms. Pena made subsequent requests for interpreters at a second shelter in Manhattan, PATH and Shakespeare Shelter.

668. Ms. Pena's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to Pena Plaintiffs' stay in the first shelter in Manhattan, the second shelter in Manhattan, PATH, Shakespeare Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted each of the Pena Plaintiffs, and which were provided to other shelter residents.

669. Plaintiff L.P. is also "person[s] aggrieved" within the meaning of the Rehabilitation Act.  29 U.S.C. § 794a(a)(2).  She has suffered independent injuries causally related to City Defendants' denial of federally required services to Ms. Pena.

670. As a proximate result of City Defendants' violations of Ms. Pena's rights under the Rehabilitation Act, Pena Plaintiffs have suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

671. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Pena Plaintiffs.

672. As a result of City Defendants' breaches of law, Pena Plaintiffs have been damaged and injured and demand compensatory damages.

## MS. SOTO

673. Ms. Soto first requested an interpreter at PATH.

674. Ms. Soto made subsequent requests for interpreters at Franklin Women's Shelter and Broadway Shelter.

675. Ms. Soto's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to her stay at PATH, Franklin Women's Shelter, Broadway Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted Ms. Soto, and which were provided to other shelter residents.

676. As a proximate result of City Defendants' violations of Ms. Soto's rights under the Rehabilitation Act, Ms. Soto has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

677. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Soto.

678. As a result of City Defendants' breaches of law, Ms. Soto has been damaged and injured and demands compensatory damages.

## MR. TAYLOR

679. Mr. Taylor first requested an interpreter at the 30th Street Men's Shelter.

680. Mr. Taylor made subsequent requests for interpreters at BRC Assessment Shelter, and Bronx Park Avenue Shelter.

681. Mr. Taylor's ability to communicate with City Defendants' shelter staff was significantly impaired, and he was excluded from discussions and decisions relating to his stay at the 30th Street Men's Shelter, BRC Assessment Shelter, Bronx Park Avenue Shelter, applications for permanent housing and other services and benefits, which would have directly benefitted Mr. Taylor, and which were provided to other shelter residents.

682. As a proximate result of City Defendants' violations of Mr. Taylor's rights under the Rehabilitation Act, Mr. Taylor has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

683. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Mr. Taylor.

684. As a result of City Defendants' breaches of law, Mr. Taylor has been damaged and injured and demands compensatory damages.

## MS. HAZEL

685. Ms. Hazel requested interpreters during her stay at city shelters.

686. Ms. Hazel's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to her stay, applications for permanent housing and other services and benefits, which would have directly benefitted her, and which were provided to other shelter residents.

687. As a proximate result of City Defendants' violations of Ms. Hazel's rights under the Rehabilitation Act, Ms. Hazel has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity,

frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

688. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Hazel.

689. As a result of City Defendants' breaches of law, Ms. Hazel has been and injured and demands compensatory damages.

## MS. DONEGAN

690. Ms. Donegan requested an interpreter during her stay at City Defendants' shelters.

691. Ms. Donegan's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to her stay, applications for permanent housing and other services and benefits, which would have directly benefitted her, and which were provided to other shelter residents.

692. As a proximate result of City Defendants' violations of Ms. Donegan's rights under the Rehabilitation Act, Ms. Donegan has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

693. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Donegan.

694. As a result of City Defendants' breaches of law, Ms. Donegan has been damaged and injured and demands compensatory damages and injunctive relief

consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

## MS. GREGOIRE

695. Ms. Gregoire requested an interpreter during her stay at City Defendants' shelters.

696. Ms. Gregoire's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to her stay, applications for permanent housing and other services and benefits, which would have directly benefitted her, and which were provided to other shelter residents.

697. As a proximate result of City Defendants' violations of Ms. Gregoire's rights under the Rehabilitation Act, Ms. Gregoire has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

698. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Gregoire.

699. As a result of City Defendants' breaches of law, Ms. Gregoire has been damaged and injured and demands compensatory damages.

## MR. RAMOS

700. Mr. Ramos requested an interpreter during his stay at City Defendants' shelters.

701. Mr. Ramos made subsequent requests for interpreters after leaving PATH and going to other shelters operated by City Defendants.

702. Mr. Ramos's ability to communicate with City Defendants' shelter staff was significantly impaired, and he was excluded from discussions and decisions relating to his stay, applications for permanent housing and other services and benefits, which would have directly benefitted her, and which were provided to other shelter residents.

703. As a proximate result of City Defendants' violations of Mr. Ramos's rights under the Rehabilitation Act, Mr. Ramos has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

704. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Mr. Ramos.

705. As a result of City Defendants' breaches of law, Mr. Ramos has been damaged and injured and demands compensatory damages.

## MR. GIAMBIANCO

706.     Mr. Giambianco requested an interpreter during his stay at City Defendants' shelters.

707. Mr. Giambianco made subsequent requests for interpreters after leaving PATH and going to other shelters operated by City Defendants.

708. Mr. Giambianco's ability to communicate with City Defendants' shelter staff was significantly impaired, and he was excluded from discussions and decisions relating to his stay, applications for permanent housing and other services and benefits, which would have directly benefitted him, and which were provided to other shelter residents.

709. As a proximate result of City Defendants' violations of Mr. Giambianco's rights under the Rehabilitation Act, Mr. Giambianco has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

710. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Mr. Giambianco.

711. As a result of City Defendants' breaches of law, Mr. Giambianco has been damaged and injured and demands compensatory damages.

## JULIE LOPEZ

Ms. Lopez requested an interpreter during her stay at PATH.

712. Ms. Lopez made subsequent requests for interpreters after leaving PATH and going to other shelters operated by City Defendants.

713. Ms. Lopez's ability to communicate with City Defendants' shelter staff was significantly impaired, and she has been excluded from discussions and decisions relating to her stay, applications for permanent housing and other services and benefits, which would have directly benefitted her, and which were provided to other shelter residents.

714. As a proximate result of City Defendants' violations of Ms. Lopez's rights under the Rehabilitation Act, Ms. Lopez has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

715. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Lopez.

716. As a result of City Defendants' breaches of law, Ms. Lopez has been damaged and injured and demands compensatory damages and injunctive relief consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

### DEMEKA HUNTER

717. Ms. Hunter requested an interpreter during her stay at Bellevue.

718. Ms. Hunter made subsequent requests for interpreters after leaving Bellevue and going to other shelters operated by City Defendants.

719. Ms. Hunter's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to her stay, applications for permanent housing and other services and benefits, which would have directly benefitted her, and which were provided to other shelter residents.

720. As a proximate result of City Defendants' violations of Ms. Hunter's rights under the Rehabilitation Act, Ms. Hunter has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

721. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Hunter.

722. As a result of City Defendants' breaches of law, Ms. Hunter has been damaged and injured and demands compensatory damages and injunctive relief

consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

## JASMINE JOHNSON

723. Ms. Johnson requested an interpreter during her stay at Bellevue.

724. Ms. Johnson made subsequent requests for interpreters after leaving Bellevue and going to other shelters operated by City Defendants.

725. Ms. Johnson's ability to communicate with City Defendants' shelter staff was significantly impaired, and she was excluded from discussions and decisions relating to her stay, applications for permanent housing and other services and benefits, which would have directly benefitted her, and which were provided to other shelter residents.

726. As a proximate result of City Defendants' violations of Ms. Johnson's rights under the Rehabilitation Act, Ms. Johnson has suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges and property, among other harms.

727. City Defendants' failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Ms. Johnson.

728. As a result of City Defendants' breaches of law, Ms. Johnson has been damaged and injured and demands compensatory damages and injunctive relief consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

## SECOND CLAIM FOR RELIEF

**Discrimination on the Basis of a Disability in Violation of
Title II of the Americans with Disabilities Act of 1990
(42 U.S.C. § 12131 et seq.)**

729. Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

730. On July 12, 1990 Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

731. At all times relevant to this action, the ADA was in full force and effect in the United States and Plaintiffs had a right not to be subjected to discrimination by City Defendants on the basis of Ms. Armenta's, Mr. Brim's, Ms. Castillo Aponte's, Mr. Colon's, Ms. Cruz's, Ms. Dominguez's, Ms. Espinosa's, Mr. Garcia's, Mr. and Mrs. Goulbourne's, Mr. Mohammed's,  Ms. Pena's, Ms. Soto's, Mr. Taylor's, Ms. Hazel's, Ms. Donegan's, Ms. Gregoire's, Mr. Ramos', Mr. Giamianco's, Ms. Lopez's, Ms. Hunter's, and Ms. Johnson's disability.  42 U.S.C. § 12182.

732. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

733. The ADA defines a disability as "a physical . . . impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A). Major life activities include hearing and speaking.  42 U.S.C. § 12102(2)(A).

734. Plaintiff Karla Armenta is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

735. Plaintiff Russell Brim is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

736.  Plaintiff Asher Brim and I.B. Brim are persons "known to have a relationship or association" with Mr. Brim because they were repeatedly identified to City Defendants as Mr. Brim's two children while living in the shelter system. 42 U.S.C. § 12182(b)(1)(E).

737. Plaintiff Tamara Castillo Aponte is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

738. Plaintiffs Maria Magdelena Astacio Castillo and Yastany Astacio are persons "known to have a relationship or association" with Ms. Aponte Castillo because they were repeatedly identified to City Defendants as Ms. Aponte Castillo's two children while living in the shelter system.  42 U.S.C. § 12182(b)(1)(E).

739. Plaintiff Walton Serrano-Colon is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

740. Plaintiff Yenny Cruz is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

741. Plaintiff Maria Dominguez is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

742. Plaintiff Shirley Espinosa is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

743. Plaintiff Ismael Garcia is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

744. Plaintiffs Keith Goulbourne and Alicia Goulbourne are qualified individuals with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

745. Plaintiff Hanif Mohammed is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

746. Plaintiff Yaana Pena is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

747.  Plaintiffs L.P. is a person "known to have a relationship or association" with Ms. Pena because she was repeatedly identified to City Defendants as Ms. Pena's child while living in the shelter system. 42 U.S.C. § 12182(b)(1)(E).

748. Plaintiff Yunissa Soto is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

749. Plaintiff Dwayne Taylor is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

750. Plaintiff Esther Hazel is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

751. Plaintiff Elizabeth Donegan is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

752. Plaintiff Marie Gregoire is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

753. Plaintiff Jesus Ramos is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

754. Plaintiff Filippo Giambianco is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

755. Plaintiff Julie Lopez is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

756. Plaintiff Demeka Hunter is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

757. Plaintiff Jasmine Johnson is a qualified individual with a disability within the meaning of the Rehabilitation Act.  42 U.S.C. § 12131(2).

758. City Defendants are public entities within the meaning of 42 U.S.C. § 12131(1) because the City of New York is a local government and New York City Department of Homeless Services is a department of New York City.

759. Regulations implementing the ADA clearly require the provision of effective communication as part of its nondiscrimination mandate.

760. Effective communication is achieved when a public accommodation furnishes "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."  28 C.F.R. § 36.303(c).

761. Auxiliary services include but are not limited to, "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments."  42 U.S.C. § 12103(1)(A); *see also* 28 C.F.R. § 36.303(b)(1).

**MS. KARLA ARMENTA**

762. City Defendants subjected Ms. Armenta to discrimination based upon Ms. Armenta's disability in violation of Ms. Armenta's rights under Title II of the ADA.

763. City Defendants repeatedly failed to provide Ms. Armenta with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' PATH office, Franklin Shelter and the Samaritan Village Shelter.

764. City Defendants failed to ensure that Ms. Armenta is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

765. City Defendants discriminated  against Ms. Armenta by failing to provide Ms. Armenta with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Armenta.

766. City Defendants treated Ms. Armenta differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## BRIM PLAINTIFFS

767. City Defendants subjected and continue to subject Brim Plaintiffs to discrimination based upon Mr. Brim's disability and/or association with Mr. Brim in violation of Brim Plaintiffs' rights under Title II of the ADA.

768. City Defendants repeatedly failed to provide Mr. Brim with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Catherine Street Shelter, Urban Family Center Shelter, the Tov-Hotel Bronx Shelter, and the Freedom House Shelter.

769. City Defendants failed to ensure that Mr. Brim is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

770. City Defendants discriminated  against Brim Plaintiffs by failing to provide Mr. Brim with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Brim Plaintiffs.

771. City Defendants treated and continue to treat Mr. Brim differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## CASTILLO APONTE PLAINTIFFS

772. City Defendants subjected Castillo Aponte Plaintiffs to discrimination based upon Ms. Castillo Aponte's disability and/or association with Ms. Castillo Aponte in violation of Castillo Aponte Plaintiffs' rights under Title II of the ADA.

773. City Defendants repeatedly failed to provide Ms. Castillo Aponte with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' PATH office and at the Frant Hotel.

774. City Defendants failed to ensure that Ms. Castillo Aponte is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

775. City Defendants discriminated  against Castillo Aponte Plaintiffs by failing to provide Ms. Castillo Aponte with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Castillo Aponte Plaintiffs.

776. City Defendants treated Ms. Castillo Aponte differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## MR. SERRANO-COLON

777. City Defendants subjected Mr. Serrano-Colon to discrimination based upon Mr. Serrano-Colon's disability in violation of Mr. Serrano-Colon's rights under Title II of the ADA.

778. City Defendants repeatedly failed to provide Mr. Serrano-Colon with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Bellevue Men's Shelter, the Shelter in Brooklyn, the Bowery Resident Community Shelter and the Project Renewal Shelter.

779. City Defendants failed to ensure that Mr. Serrano-Colon is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

780. City Defendants discriminated against Mr. Serrano-Colon by failing to provide Mr. Serrano-Colon with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Mr. Serrano-Colon.

781. City Defendants treated and continue to treat Mr. Serrano-Colon differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## MS. CRUZ

782. City Defendants subjected and continue to subject Ms. Cruz to discrimination based upon Ms. Cruz's disability in violation of Ms. Cruz's rights under Title II of the ADA.

783. City Defendants repeatedly failed and continue to fail to provide Ms. Cruz with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' PATH office, a shelter in Manhattan, a shelter in Queens, the Franklin Women's Shelter, and other shelters.

784. City Defendants failed and continue to fail to ensure that Ms. Cruz is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

785. City Defendants discriminated and continue to discriminate against Ms. Cruz by failing to provide Ms. Cruz with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Cruz.

786. City Defendants treated and continue to treat Ms. Cruz differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

### MS. DOMINGUEZ

787. City Defendants subjected Ms. Dominguez to discrimination based upon Ms. Dominguez's disability in violation of Ms. Dominguez's rights under Title II of the ADA.

788. City Defendants repeatedly failed to provide Ms. Dominguez with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Brooklyn Women's Shelter.

789. City Defendants failed to ensure that Ms. Dominguez is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

790. City Defendants discriminated against Ms. Dominguez by failing to provide Ms. Dominguez with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Dominguez.

791. City Defendants treated Ms. Dominguez differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## MS. ESPINOSA

792. City Defendants subjected and continue to subject Ms. Espinosa to discrimination based upon Ms. Espinosa's disability in violation of Ms. Espinosa's rights under Title II of the ADA.

793. City Defendants repeatedly failed and continue to fail to provide Ms. Espinosa with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' shelter on Staten Island, PATH, Eden Motel Bronx Shelter and Project Hospitality House.

794. City Defendants failed and continue to fail to ensure that Ms. Espinosa is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

795. City Defendants discriminated and continue to discriminate against Ms. Espinosa by failing to provide Ms. Espinosa with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Espinosa.

796. City Defendants treated and continue to treat Ms. Espinosa differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## MR. GARCIA

797. City Defendants subjected Mr. Garcia to discrimination based upon Mr. Garcia's disability and/or association with Mr. Garcia in violation of Mr. Garcia's rights under Title II of the ADA.

798. City Defendants repeatedly failed to provide Mr. Garcia with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' 30th Street Men's Shelter and at the Atlantic Avenue Men's Shelter.

799. City Defendants failed to ensure that Mr. Garcia is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

800. City Defendants discriminated against Mr. Garcia by failing to provide Mr. Garcia with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Mr. Garcia.

801. City Defendants treated Mr. Garcia differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## GOULBOURNE PLAINTIFFS

802. City Defendants subjected Goulbourne Plaintiffs to discrimination based upon Mr. Goulbourne and Mrs. Goulbourne's disability in violation of Goulbourne Plaintiffs' rights under Title II of the ADA.

803. City Defendants repeatedly failed to provide Mr. Goulbourne and Mrs. Goulbourne with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' PATH office and at the Bronx Neighborhood Center.

804. City Defendants failed to ensure that Mr. Goulbourne and Mrs. Goulbourne is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

805. City Defendants discriminated against Goulbourne Plaintiffs by failing to provide Mr. Goulbourne and Mrs. Goulbourne with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Brim Plaintiffs.

806. City Defendants treated Mr. Goulbourne and Mrs. Goulbourne differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## MR. MOHAMMED

807. City Defendants subjected and continue to subject Mr. Mohammed to discrimination based upon Mr. Mohammed's disability and/or association with Mr. Mohammed in violation of Mr. Mohammed's rights under Title II of the ADA.

808. City Defendants repeatedly failed and continue to fail to provide Mr. Mohammed with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' 30th Street Men's Shelter and at the Kingsboro Shelter.

809. City Defendants failed and continue to fail to ensure that Mr. Mohammed is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

810. City Defendants discriminated and continue to discriminate against Mr. Mohammed by failing to provide Mr. Mohammed with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Mr. Mohammed.

811. City Defendants treated and continue to treat Mr. Mohammed differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

**PENA PLAINTIFFS**

812. City Defendants subjected Pena Plaintiffs to discrimination based upon Mr. Brim's disability and/or association with Ms. Pena in violation of Pena Plaintiffs' rights under Title II of the ADA.

813. City Defendants repeatedly failed to provide Ms. Pena with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' shelter in Manhattan, the second shelter in Manhattan, PATH, Shakespeare Shelter.

814. City Defendants failed to ensure that Ms. Pena is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

815. City Defendants discriminated against Pena Plaintiffs by failing to provide Ms. Pena with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Pena Plaintiffs.

816. City Defendants treated Ms. Pena differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

**MS. SOTO**

817. City Defendants subjected Ms. Soto to discrimination based upon Ms. Soto's disability in violation of Ms. Soto's rights under Title II of the ADA.

818. City Defendants repeatedly failed to provide Ms. Soto with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' PATH office, Franklin Women's Shelter, and Broadway Shelter.

819. City Defendants failed to ensure that Ms. Soto is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

820. City Defendants discriminated against Ms. Soto by failing to provide Ms. Soto with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Soto.

821. City Defendants treated Ms. Soto differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## **MR. TAYLOR**

822. City Defendants subjected Mr. Taylor to discrimination based upon Mr. Taylor's disability and/or association with Mr. Taylor in violation of Mr. Taylor's rights under Title II of the ADA.

823. City Defendants repeatedly failed to provide Mr. Taylor with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' 30th Street Men's Shelter, BRC Assessment Shelter, and Bronx Park Avenue Shelter.

824. City Defendants failed to ensure that Mr. Taylor is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

825. City Defendants discriminated against Mr. Taylor by failing to provide Mr. Taylor with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Mr. Taylor.

826. City Defendants treated Mr. Taylor differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

### MS. HAZEL

827. City Defendants subjected Ms. Hazel to discrimination based upon Ms. Hazel's disability and/or association with Ms. Hazel in violation of Ms. Hazel's rights under Title II of the ADA.

828. City Defendants repeatedly failed to provide Ms. Hazel with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Franklin, Hopper House and other shelters within the City Defendants' shelter system.

829. City Defendants failed to ensure that Ms. Hazel is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

830. City Defendants discriminated against Ms. Hazel by failing to provide Ms. Hazel with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Hazel.

831. City Defendants treated Ms. Hazel differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

**MS. DONEGAN**

832. City Defendants subjected and continue to subject Ms. Donegan to discrimination based upon Ms. Donegan's disability in violation of Ms. Donegan's rights under Title II of the ADA.

833. City Defendants repeatedly failed and continue to fail to provide Ms. Donegan with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Bellevue, Family Shelter in Jamaica and Beach Residence within the City Defendants' shelter system.

834. City Defendants failed and continue to fail to ensure that Ms. Donegan is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

835. City Defendants discriminated and continue to discriminate against Ms. Donegan by failing to provide Ms. Donegan with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Donegan.

836. City Defendants treated and continue to treat Ms. Donegan differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

**MS. GREGOIRE**

837. City Defendants subjected Ms. Gregoire to discrimination based upon Ms. Gregoire's disability and/or association with Ms. Gregoire in violation of Ms. Gregoire's rights under Title II of the ADA.

838. City Defendants repeatedly failed to provide Ms. Gregoire with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' PATH office and other shelters within the City Defendants' shelter system.

839. City Defendants failed to ensure that Ms. Gregoire is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

840. City Defendants discriminated against Ms. Gregoire by failing to provide Ms. Gregoire with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Gregoire.

841. City Defendants treated Ms. Gregoire differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## **MR. RAMOS**

842. City Defendants subjected Mr. Ramos to discrimination based upon Mr. Ramos' disability in violation of Mr. Ramo's rights under Title II of the ADA.

843. City Defendants repeatedly failed to provide Mr. Ramos with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' 30th Street Shelter, Wards Island and Bronx Park Avenue Shelter within the City Defendants' shelter system.

844. City Defendants failed to ensure that Mr. Ramos is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

845. City Defendants discriminated against Mr. Ramos by failing to provide Mr. Ramos with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Mr. Ramos.

846. City Defendants treated Mr. Ramos differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## MR. GIAMBIANCO

847. City Defendants subjected Mr. Giambianco to discrimination based upon Mr. Giambianco's disability in violation of Mr. Giambianco's rights under Title II of the ADA.

848. City Defendants repeatedly to provide Mr. Giambianco with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' 30th Street Shelter, BRC, BronxWorks within the City Defendants' shelter system.

849. City Defendants failed to ensure that Mr. Giambianco is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

850. City Defendants discriminated against Mr. Giambianco by failing to provide Mr. Giambianco with qualified sign language interpreters during meetings with

caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Mr. Giambianco.

851. City Defendants treated Mr. Giambianco differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

**MS. LOPEZ**

852. City Defendants subjected and continue to subject Ms.Lopez to discrimination based upon Ms. Lopez's disability in violation of Ms. Lopez's rights under Title II of the ADA.

853. City Defendants repeatedly failed and continue to fail to provide Ms. Lopez with auxiliary services in the form of qualified interpreters on numerous occasions at PATH and another Bronx shelter within the City Defendants' shelter system.

854. City Defendants failed and continue to fail to ensure that Ms. Lopez is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

855. City Defendants discriminated and continue to discriminate against Ms. Lopez by failing to provide Ms. Lopez with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Lopez.

856. City Defendants treated and continue to treat Ms. Lopez differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

**MS. HUNTER**

857. City Defendants subjected and continue to subject Ms. Hunter to discrimination based upon Ms. Hunter's disability in violation of Ms. Hunter's rights under Title II of the ADA.

858. City Defendants repeatedly failed and continue to fail to provide Ms. Hunter with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Bellevue and a Bronx shelter within the City Defendants' shelter system.

859. City Defendants failed and continue to fail to ensure that Ms. Hunter is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

860. City Defendants discriminated and continue to discriminate against Ms. Hunter by failing to provide Ms. Hazel with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Hunter.

861. City Defendants treated and continue to treat Ms. Hunter differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

## MS. JOHNSON

862. City Defendants subjected and continue to subject Ms. Johnson to discrimination based upon Ms. Johnson's disability in violation of Ms. Johnson's rights under Title II of the ADA.

863. City Defendants repeatedly failed and continue to fail to provide Ms. Johnson with auxiliary services in the form of qualified interpreters on numerous occasions at Bellevue and another Bronx shelter within the City Defendants' shelter system.

864. City Defendants failed and continue to fail to ensure that Ms. Johnson is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12132.

865. City Defendants discriminated and continue to discriminate against Ms. Johnson by failing to provide Ms. Johnson with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions were and are made concerning housing for Ms. Johnson.

866. City Defendants treated and continue to treat Ms. Johnson differently than hearing individuals by not providing the necessary auxiliary services that would enabled her to effectively communicate with caseworkers and shelter staff.

867. City Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting City Defendants' shelter system and housing facilities.

868. Title II of the ADA, 42 U.S.C. § 12131, *et seq*. and the operable regulations adopted thereunder, require public entities to make "reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7).

869. City Defendants have violated Title II of the ADA by: denying Plaintiffs the benefits of their services, programs, and activities and subjecting Plaintiffs to discrimination; refusing to make reasonable modifications in their policies, practices or procedures necessary to afford Ms. Armenta, Mr. Brim, Ms. Castillo Aponte, Mr. Colon, Ms. Cruz, Ms. Dominguez, Ms. Espinosa, Mr. Garcia, Mr. and Mrs. Goulbourne, Mr. Mohammed, Ms. Pena, Ms. Soto, Mr. Taylor, Ms. Hazel, Ms. Donegan, Ms. Gregoire,

Mr. Ramos, Mr. Giambianco,  Ms. Lopez, Ms. Hunter, and Ms. Johnson and other individuals with disabilities access to the services and privileges offered by Defendants, in violation of 28 C.F.R. § 35.130(b)(7); using criteria or methods of administration of its services, programs, or activities, the effect of which discriminates against Plaintiffs because of Ms. Armenta's, Mr. Brim's, Ms. Castillo Aponte's, Mr. Colon's, Ms. Cruz's, Ms. Dominguez's, Ms. Espinosa's, Mr. Garcia's, Mr. and Mrs. Goulbourne's, Mr. Mohammed's, Ms. Pena's, Ms. Soto's,  Mr. Taylor's, Ms. Hazel's, Ms. Donegan's, Ms. Gregoire's, Mr. Ramos', Mr. Giambianco's, Ms. Lopez's, Ms. Hunter's and Ms. Johnson's disabilities; adopting and enforcing or refusing to adopt and enforce policies and practices designed and intended to ensure that Plaintiffs have access and enjoyment of emergency shelter services in a manner equal to those without disabilities; and aiding or perpetuating discrimination against persons with disabilities by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing public services or benefits.

870. City Defendants' violations of Ms. Armenta's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Armenta to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

871. City Defendants' violations of Brim Plaintiffs' rights under Title II of the ADA have proximately caused and continue to proximately cause Brim Plaintiffs to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and

suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

872. City Defendants' violations of Castillo Aponte Plaintiffs' rights under Title II of the ADA have proximately caused and continue to proximately cause Castillo Aponte Plaintiffs to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

873. City Defendants' violations of Mr. Serrano-Colon's rights under Title II of the ADA have proximately caused and continue to proximately cause Mr. Serrano-Colon to suffer discrimination, unequal treatment, exclusion, violations of his rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

874. City Defendants' violations of Ms. Cruz's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Cruz to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

875. City Defendants' violations of Ms. Dominguez's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Dominguez to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and

suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

876. City Defendants' violations of Ms. Espinosa's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Espinosa to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

877. City Defendants' violations of Mr. Garcia's rights under Title II of the ADA have proximately caused and continue to proximately cause Mr. Garcia to suffer discrimination, unequal treatment, exclusion, violations of his rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

878. City Defendants' violations of Goulbourne Plaintiffs' rights under Title II of the ADA have proximately caused and continue to proximately cause Goulbourne Plaintiffs to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

879. City Defendants' violations of Mr. Mohammed's rights under Title II of the ADA have proximately caused and continue to proximately cause Mr. Mohammed to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and

suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

880. City Defendants' violations of Pena Plaintiffs' rights under Title II of the ADA have proximately caused and continue to proximately cause Pena Plaintiffs to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

881. City Defendants' violations of Ms. Soto's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Soto to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

882. City Defendants' violations of Mr. Taylor's rights under Title II of the ADA have proximately caused and continue to proximately cause Mr. Taylor to suffer discrimination, unequal treatment, exclusion, violations of his rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

883. City Defendants' violations of Ms. Hazel's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Hazesl to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

884. City Defendants' violations of Ms. Donegan's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Donegan to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

885. City Defendants' violations of Ms. Gregoire's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Gregoire to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

886. City Defendants' violations of Ms. Lopez's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Lopez to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

887. City Defendants' violations of Ms. Hunter's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Hunter to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

888. City Defendants' violations of Ms. Johnson's rights under Title II of the ADA have proximately caused and continue to proximately cause Ms. Johnson to suffer discrimination, unequal treatment, exclusion, violations of her rights under the laws of

the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

889. City Defendants' violations of Mr. Ramos' rights under Title II of the ADA have proximately caused and continue to proximately cause Mr. Taylor to suffer discrimination, unequal treatment, exclusion, violations of his rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

890. City Defendants' violations of Mr. Giambianco's rights under Title II of the ADA have proximately caused and continue to proximately cause Mr. Giambianco to suffer discrimination, unequal treatment, exclusion, violations of his rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

891. As a result of City Defendants' breaches of law, Plaintiffs have been damaged and injured and demand compensatory damages and injunctive relief consistent with the reasonable accommodations noted above requiring City Defendants to operate in compliance with applicable laws and regulations.

### THIRD CLAIM FOR RELIEF

**Discrimination on the Basis of a Disability in Violation of
Title III of the Americans with Disabilities Act of 1990
(42 U.S.C. § 12181 et seq.)**

892. Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

893. Title III of the ADA requires that, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services,

facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).

894. Plaintiff Walton Serrano-Colon is a qualified individual. Mr. Colon has a "disability" within the meaning of 42 U.S.C. § 12132(2).

895. Plaintiff Yenny Cruz is a qualified individual. Ms. Cruz has a "disability" within the meaning of 42 U.S.C. § 12132(2).

896. Plaintiff Shirley Espinosa is a qualified individual. Ms. Espinosa has a "disability" within the meaning of 42 U.S.C. § 12132(2).

897. Plaintiff Hanif Mohammed is a qualified individual. Mr. Mohammed has a "disability" within the meaning of 42 U.S.C. § 12132(2).

898. Plaintiff Elizabeth Donegan is a qualified individual. Ms, Donegan has a "disability" within the meaning of 42 U.S.C. § 12132(2).

899. Plaintiff Julie Lopez is a qualified individual. Ms. Lopez has a "disability" within the meaning of 42 U.S.C. § 12132(2).

900. Plaintiff Demeka Hunter is a qualified individual. Ms. Hunter has a "disability" within the meaning of 42 U.S.C. § 12132(2).

901. Plaintiff Jasmine Johnson is a qualified individual. Ms. Johnson has a "disability" within the meaning of 42 U.S.C. § 12132(2).

902. City Defendants' shelters are places of "public accommodation" within the meaning of the ADA.  42 U.S.C. § 12181(7)(F).

903. Defendants own, lease (or lease to), or operate places of public accommodation.  42 U.S.C. § 12182(a).

904. Under Title III of the ADA, discrimination is identified, in part, as "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, . . . or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

905. As described above, Defendants subjected Plaintiffs to discrimination based upon Mr. Colon's, Ms. Cruz's, Ms. Espinosa's, Mr. Mohammed's, Ms. Donegan's, Ms. Gregoire's, Ms. Lopez's, Ms. Hunter's, and Ms. Johnson's disabilities in violation of their rights under Title III of the ADA.

## MR. SERRANO-COLON

906. City Defendants repeatedly failed and continue to fail to provide Mr. Serrano-Colon with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Bellevue Men's Shelter, another shelter, the Bowery Resident Community Shelter and the Project Renewal Shelter.

907. City Defendants failed and continue to fail to ensure that Mr. Serrano-Colon is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12182(b)(2)(A).

908. City Defendants discriminated and continue to discriminate against Mr. Serrano-Colon by refusing to provide Mr. Serrano-Colon with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions need to be made concerning housing for Mr. Serrano-Colon.

909. City Defendants treat Mr. Serrano-Colon differently than hearing individuals by not providing Mr. Serrano-Colon the necessary auxiliary services that would enable her to effectively communicate with caseworkers and shelter staff on behalf of her own and her children's housing needs.

910. As a proximate cause of City Defendants' violations of Mr. Serrano-Colon's rights under Title III of the ADA, Mr. Serrano-Colon has suffered and continues to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

911. As a result of The City Defendants' breaches of law, Mr. Serrano-Colon has been damaged and injured and demands injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

## MS. CRUZ

912. City Defendants repeatedly failed and continue to fail to provide Ms. Cruz with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' PATH office, shelter in Manhattan, shelter in Queens, the Franklin Women's Shelter, and other Shelters.

913. City Defendants failed and continue to fail to ensure that Ms. Cruz is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12182(b)(2)(A).

914. City Defendants discriminated and continue to discriminate against Ms. Cruz by refusing to provide Ms. Cruz with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions need to be made concerning housing for Ms. Cruz.

915. City Defendants treat Ms. Cruz differently than hearing individuals by not providing Ms. Cruz the necessary auxiliary services that would enable her to effectively

communicate with caseworkers and shelter staff on behalf of her own and her children's housing needs.

916. As a proximate cause of City Defendants' violations of Ms. Cruz's rights under Title III of the ADA, Ms. Cruz has suffered and continues to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

917. As a result of The City Defendants' breaches of law, Ms. Cruz has been damaged and injured and demands injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

## MS. ESPINOSA

918. City Defendants repeatedly failed and continue to fail to provide Ms. Espinosa with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' shelter on Staten Island, PATH, Eden Motel Bronx Shelter and Project Hospitality House.

919. City Defendants failed and continue to fail to ensure that Ms. Espinosa is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12182(b)(2)(A).

920. City Defendants discriminated and continue to discriminate against Ms. Espinosa by refusing to provide Ms. Espinosa with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions need to be made concerning housing for Ms. Espinosa.

921. City Defendants treat Ms. Espinosa differently than hearing individuals by not providing Ms. Espinosa the necessary auxiliary services that would enable her to effectively communicate with caseworkers and shelter staff on behalf of her own and her children's housing needs.

922. As a proximate cause of City Defendants' violations of Ms. Espinosa's rights under Title III of the ADA, Ms. Espinosa has suffered and continues to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

923. As a result of The City Defendants' breaches of law, Ms. Espinosa has been damaged and injured and demands injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

## MR. MOHAMMED

924. City Defendants repeatedly failed and continue to fail to provide Mr. Mohammed with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' 30th Street Men's Shelter and at the Kingsboro Shelter.

925. City Defendants failed and continue to fail to ensure that Mr. Mohammed is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12182(b)(2)(A).

926. City Defendants discriminated and continue to discriminate against Mr. Mohammed by refusing to provide Mr. Mohammed with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions need to be made concerning housing for Mr. Mohammed.

927. City Defendants treat Mr. Mohammed differently than hearing individuals by not providing Mr. Mohammed the necessary auxiliary services that would enable him to effectively communicate with caseworkers and shelter staff on behalf of her own and her children's housing needs.

928. As a proximate cause of City Defendants' violations of Mr. Mohammed's rights under Title III of the ADA, Mr. Mohammed has suffered and continues to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

929. As a result of The City Defendants' breaches of law, Mr. Mohammed has been damaged and injured and demands injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

## MS. LOPEZ

930. City Defendants repeatedly failed and continue to fail to provide Ms. Lopez with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' PATH office and other City Defendants' facilities

931. City Defendants failed and continue to fail to ensure that Ms. Lopez is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12182(b)(2)(A).

932. City Defendants discriminated and continue to discriminate against Ms. Lopez by refusing to provide Ms. Lopez with qualified sign language interpreters during

meetings with caseworkers and shelter staff, including during critical meetings when decisions need to be made concerning housing for Ms. Lopez.

933. City Defendants treat Ms. Lopez differently than hearing individuals by not providing Ms. Lopez the necessary auxiliary services that would enable her to effectively communicate with caseworkers and shelter staff on behalf of her own and her children's housing needs.

934. As a proximate cause of City Defendants' violations of Ms. Lopez's rights under Title III of the ADA, Ms. Lopez has suffered and continues to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

935. As a result of The City Defendants' breaches of law, Ms. Lopez has been damaged and injured and demands injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

**MS. HUNTER**

936.    City Defendants repeatedly failed and continue to fail to provide Ms. Hunter with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Bellevue and other City Defendants' facilities

937.    City Defendants failed and continue to fail to ensure that Ms. Hunter is not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12182(b)(2)(A).

938. City Defendants discriminated and continue to discriminate against Ms. Hunter by refusing to provide Ms. Hunter with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions need to be made concerning housing for Ms. Hunter.

939. City Defendants treat Ms. Hunter differently than hearing individuals by not providing Ms. Hunter the necessary auxiliary services that would enable her to effectively communicate with caseworkers and shelter staff on behalf of her own housing needs.

940. As a proximate cause of City Defendants' violations of Ms. Hunter's rights under Title III of the ADA, Ms. Hunter has suffered and continues to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

941. As a result of The City Defendants' breaches of law, Ms. Hunter has been damaged and injured and demands injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

## MS. JOHNSON

942.    City Defendants repeatedly failed and continue to fail to provide Ms. Johnson with auxiliary services in the form of qualified interpreters on numerous occasions at Defendants' Bellevue and other City Defendants' facilities

943.    City Defendants failed and continue to fail to ensure that Ms. City Defendants repeatedly failed and continue to fail to provide Ms. Johnson is not excluded,

denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12182(b)(2)(A).

944. City Defendants discriminated and continue to discriminate against Ms. Johnson by refusing to provide Ms. Johnson with qualified sign language interpreters during meetings with caseworkers and shelter staff, including during critical meetings when decisions need to be made concerning housing for Ms. Johnson.

945. City Defendants treat Ms. Johnson differently than hearing individuals by not providing Ms. Johnson the necessary auxiliary services that would enable her to effectively communicate with caseworkers and shelter staff on behalf of her own housing needs.

946. As a proximate cause of City Defendants' violations of Ms. Johnson's rights under Title III of the ADA, Ms. Johnson has suffered and continues to suffer discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights, privileges, and property.

947. As a result of The City Defendants' breaches of law, Ms. Johnson has been damaged and injured and demands injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

948. Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

949. As a result of Defendants' breaches of law, Plaintiffs have been damaged and injured and demand injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

## FOURTH CLAIM FOR RELIEF

**New York City Human Rights Law**
**N.Y.C. Admin. Code § 8-101 et seq.**

950. Plaintiff Karla Armenta has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

951. Plaintiff Russell Brim has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that he is deaf.

952. Plaintiffs Asher Brim and I.B. had a known "relationship or association" with Mr. Brim, in that they were identified to The City Defendants on numerous occasions as his two children.

953. Plaintiff Tamara Castillo Aponte has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

954. Plaintiffs Maria and Yasanty had a known "relationship or association" with Ms. Castillo Aponte, in that they were identified to The City Defendants on numerous occasions as her two children.

955. Plaintiff Walton Serrano-Colon has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that he is deaf.

956. Plaintiff Yenny Cruz has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

957. Plaintiff Maria Dominguez has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

958. Plaintiff Shirley Espinosa has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

959. Plaintiff Ismael Garcia has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that he is deaf.

960. Plaintiffs Keith Goulbourne and Alicia Goulbourne have a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that they are deaf.

961. Plaintiff Hanif Mohammed has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that he is deaf.

962. Plaintiff Yaana Pena has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

963. Plaintiffs L.P. had a known "relationship or association" with Ms. Pena, in that she was identified to The City Defendants and on numerous occasions as her child.

964. Plaintiff Yunissa Soto has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

965. Plaintiff Dwayne Taylor has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that he is deaf.

966. Plaintiff Esther Hazel has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

967. Plaintiff Elizabeth Donegan has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

968. Plaintiff Marie Gregoire has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

969. Plaintiff Jesus Ramos has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that he is deaf.

970. Plaintiff Filippo Giambianco has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that he is deaf.

971. Plaintiff Julie Lopez has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

972. Plaintiff Demeka Hunter has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

973. Plaintiff Jasmine Johnson has a "disability" as defined in New York City Human Rights Law, Sec. 8-102 (16)(a), in that she is deaf.

974. City Defendants' shelters are places of "housing accommodation[s]" and "publicly-assisted housing accommodations" within the meaning of New York City Human Rights Law, Sec. 8–102 (10)–(11).  These "governmental bodies or agencies" are also "covered entit[ies]," in that they are prohibited from engaging in unlawful discriminatory practices.  NY City Human Rights Law § 8–102 (1), (17).

975. Providing a sign language interpreter in order to allow deaf or hard of hearing individuals to communicate with governmental bodies during critical meetings in which publicly-assisted housing decisions are made for deaf or hard of hearing individuals and their minor children is a "reasonable accommodation" within the meaning of New York City Human Rights Law, Sec. 8-102 (18).

976. City Defendants discriminated against Ms. Armenta on the basis of Ms. Armenta's disability and failed to make a "reasonable accommodation" for Ms. Armenta's disability when they failed to provide Ms. Armenta with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Armenta.  New York City Human Rights Law, Sec. 8-107 (5), (15).

977. City Defendants discriminated against Brim Plaintiffs on the basis of Mr. Brim's disability and/or association with Mr. Brim and failed to make a "reasonable accommodation" for Mr. Brim's disability when they failed to provide Mr. Brim with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for all Brim Plaintiffs.  New York City Human Rights Law, Sec. 8-107 (5), (15).

978. City Defendants discriminated against Castillo Aponte Plaintiffs on the basis of Ms. Castillo Aponte's disability and/or association with Ms. Castillo Aponte and failed to make a "reasonable accommodation" for Ms. Castillo Aponte's disability when they failed to provide Ms. Castillo Aponte with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for all Castillo Aponte Plaintiffs.  New York City Human Rights Law, Sec. 8-107 (5), (15).

979. City Defendants discriminated against Mr. Serrano-Colon on the basis of Mr. Colon's disability and failed to make a "reasonable accommodation" for Mr. Serrano-Colon's disability when they failed to provide Mr. Serrano-Colon with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during

critical meetings when decisions were made concerning housing for Mr. Serrano-Colon. New York City Human Rights Law, Sec. 8-107 (5), (15).

980. City Defendants discriminated against Ms. Cruz on the basis of Ms. Cruz's disability and failed to make a "reasonable accommodation" for Ms. Cruz's disability when they failed to provide Ms. Cruz with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Cruz.  New York City Human Rights Law, Sec. 8-107 (5), (15).

981. City Defendants discriminated against Dominguez on the basis of Dominguez's disability and failed to make a "reasonable accommodation" for Dominguez's disability when they failed to provide Dominguez with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Dominguez.  New York City Human Rights Law, Sec. 8-107 (5), (15).

982. City Defendants discriminated against Ms. Espinosa on the basis of Ms. Espinosa's disability and failed to make a "reasonable accommodation" for Ms. Espinosa's disability when they failed to provide Ms. Espinosa with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Espinosa.  New York City Human Rights Law, Sec. 8-107 (5), (15).

983. City Defendants discriminated against Mr. Garcia on the basis of Mr. Garcia's disability and failed to make a "reasonable accommodation" for Mr. Garcia's disability when they failed to provide Mr. Garcia with a qualified sign language

interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Mr. Garcia.  New York City Human Rights Law, Sec. 8-107 (5), (15).

984. City Defendants discriminated against Goulbourne Plaintiffs on the basis of Mr. Goulbourne and Mrs. Goulbourne's disability and failed to make a "reasonable accommodation" for Mr. Goulbourne and Mrs. Goulbourne's disability when they failed to provide Mr. Goulbourne and Mrs. Goulbourne with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for all Goulbourne Plaintiffs. New York City Human Rights Law, Sec. 8-107 (5), (15).

985. City Defendants discriminated against Mr. Mohammed on the basis of Mr. Mohammed's disability and failed to make a "reasonable accommodation" for Mr. Mohammed's disability when they failed to provide Mr. Mohammed with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Mr. Mohammed.  New York City Human Rights Law, Sec. 8-107 (5), (15).

986. City Defendants discriminated against Pena Plaintiffs on the basis of Ms. Pena's disability and failed to make a "reasonable accommodation" for Ms. Pena's disability when they failed to provide Ms. Pena with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for all Pena Plaintiffs.  New York City Human Rights Law, Sec. 8-107 (5), (15).

987. City Defendants discriminated against Ms. Soto on the basis of Ms. Soto's disability and failed to make a "reasonable accommodation" for Ms. Soto's disability when they failed to provide Ms. Soto with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Soto.  New York City Human Rights Law, Sec. 8-107 (5), (15).

988. City Defendants discriminated against Mr. Taylor on the basis of Mr. Taylor's disability and failed to make a "reasonable accommodation" for Mr. Taylor's disability when they failed to provide Mr. Taylor with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Mr. Taylor.  New York City Human Rights Law, Sec. 8-107 (5), (15).

989. City Defendants discriminated against Ms. Hazel on the basis of Ms. Hazel's disability and failed to make a "reasonable accommodation" for Ms. Hazel's disability when they failed to provide Ms. Hazel with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Hazel.  New York City Human Rights Law, Sec. 8-107 (5), (15).

990. City Defendants discriminated against Ms. Donegan on the basis of Ms. Donegan's disability and failed to make a "reasonable accommodation" for Ms. Donegan's disability when they failed to provide Ms. Donegan with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during

critical meetings when decisions were made concerning housing for Ms. Donegan.  New York City Human Rights Law, Sec. 8-107 (5), (15).

991. City Defendants discriminated against Ms. Gregoire on the basis of Ms. Gregoire's disability and failed to make a "reasonable accommodation" for Ms. Gregoire's disability when they failed to provide Ms. Gregoire with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Gregoire.  New York City Human Rights Law, Sec. 8-107 (5), (15).

992. City Defendants discriminated against Mr. Ramos on the basis of Mr. Ramos' disability and failed to make a "reasonable accommodation" for Mr. Ramos' disability when they failed to provide Mr. Ramos with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Mr. Ramos. New York City Human Rights Law, Sec. 8-107 (5), (15).

993. City Defendants discriminated against Mr. Giambianco on the basis of Mr. Giambianco's disability and failed to make a "reasonable accommodation" for Mr. Giambianco's disability when they failed to provide Mr. Giambianco with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Mr. Giambianco.  New York City Human Rights Law, Sec. 8-107 (5), (15).

994. City Defendants discriminated against Ms. Lopez on the basis of Ms. Lopez's disability and failed to make a "reasonable accommodation" for Ms. Lopez's disability when they failed to provide Ms. Lopez with a qualified sign language

interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Lopez.  New York City Human Rights Law, Sec. 8-107 (5), (15).

995. City Defendants discriminated against Ms. Hunter on the basis of Ms. Hunter's disability and failed to make a "reasonable accommodation" for Ms. Hunter's disability when they failed to provide Ms. Hunter with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Hunter.  New York City Human Rights Law, Sec. 8-107 (5), (15).

996. City Defendants discriminated against Ms. Johnson on the basis of Ms. Johnson's disability and failed to make a "reasonable accommodation" for Ms. Johnson's disability when they failed to provide Ms. Johnson with a qualified sign language interpreter during meetings with caseworkers and shelter staff, including during critical meetings when decisions were made concerning housing for Ms. Johnson.  New York City Human Rights Law, Sec. 8-107 (5), (15).

997. Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf or hard of hearing clients visiting Defendants' shelter system and housing facilities.

998. As a result of Defendants' actions in violation of New York City Human Rights Law, Plaintiffs were damaged and injured.

999. Ms. Armenta was caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be

capable of effectively communicating with Ms. Armenta due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1000.   Brim Plaintiffs were caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Mr. Brim, due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1001.   Castillo Aponte Plaintiffs were caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Ms. Castillo Aponte, due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1002.   Mr. Serrano-Colon was caused to suffer and continues to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, will be capable of effectively communicating with Mr. Serrano-Colon, due to City Defendants' continued failure to provide reasonable accommodations such as qualified interpreters.

1003.   Ms. Cruz was caused to suffer and continues to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, will be capable of effectively communicating with Ms. Cruz, due to City Defendants' continued failure to provide reasonable accommodations such as qualified interpreters.

1004.   Ms. Dominguez was caused to suffer  as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be

capable of effectively communicating with Ms. Dominguez, due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1005.   Ms. Espinosa was caused to suffer and continues to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, will be capable of effectively communicating with Ms. Espinosa, due to City Defendants' continued failure to provide reasonable accommodations such as qualified interpreters.

1006.   Mr. Garcia was caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Mr. Garcia, due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1007.   Goulbourne Plaintiffs were caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Mr. Goulbourne and Mrs. Goulbourne, due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1008.   Mr. Mohammed was caused to suffer and continues to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, will be capable of effectively communicating with Mr. Mohammed, due to City Defendants' continued failure to provide reasonable accommodations such as qualified interpreters.

1009.   Pena Plaintiffs were caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be

capable of effectively communicating with Ms. Pena, due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1010.  Ms. Soto was caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Ms. Soto, due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1011.  Mr. Taylor was caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Mr. Taylor, due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1012.  Ms. Hazel was caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Ms. Hazel due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1013.  Ms. Donegan was caused to suffer and continues to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, will be capable of effectively communicating with Ms. Donegan due to City Defendants' continued failure to provide reasonable accommodations such as qualified interpreters.

1014.  Ms. Gregoire was caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Ms. Gregoire due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1015.   Mr. Ramos was caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Mr. Ramos due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1016.   Mr. Giambianco was caused to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, would be capable of effectively communicating with Mr. Giambianco due to City Defendants' failure to provide reasonable accommodations such as qualified interpreters.

1017.   Ms. Lopez was caused to suffer and continues to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, will be capable of effectively communicating with Ms. Lopez due to City Defendants' continued failure to provide reasonable accommodations such as qualified interpreters.

1018.   Ms. Hunter was caused to suffer and continues to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, will be capable of effectively communicating with Ms. Hunter due to City Defendants' continued failure to provide reasonable accommodations such as qualified interpreters.

1019.   Ms. Johnson was caused to suffer and continues to suffer as a consequence of never knowing whether City Defendants, in attempting to render services at homeless shelters, will be capable of effectively communicating with Ms. Johnson due to City Defendants' continued failure to provide reasonable accommodations such as qualified interpreters.

1020.   Defendants have wantonly, recklessly and maliciously acted with disregard for the rights and wellbeing of Plaintiffs and Plaintiffs are thereby entitled to punitive damages.

1021.   By reason of the foregoing, Plaintiffs demand compensatory and punitive damages and injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

**FIFTH CLAIM FOR RELIEF**

**New York State Human Rights Law**
**N.Y. Exec. Law § 292**

1022.   Plaintiff Karla Armenta has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1023.   Plaintiff Russell Brim has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that he is deaf.

1024.   Plaintiffs Asher Brim and I.B. had a known "relationship or association" with Mr. Brim, in that they were identified to City Defendants on numerous occasions as his two children.

1025.   Plaintiff Tamara Castillo Aponte has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1026.   Plaintiffs Maria and Yastany had a known "relationship or association" with Ms. Castillo Aponte, in that they were identified to City Defendants on numerous occasions as her two children.

1027.   Plaintiff Walton Serrano-Colon has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that he is deaf.

1028.   Plaintiff Yenny Cruz has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1029.   Plaintiff Maria Dominguez has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1030.   Plaintiff Shirley Espinosa has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1031.   Plaintiff Ismael Garcia has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that he is deaf.

1032.   Plaintiffs Keith Goulbourne and Alicia Goulbourne have a "disability" as defined in New York State Human Rights Law Section 292 (21), in that they are deaf.

1033.   Plaintiff Hanif Mohammed has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that he is deaf.

1034.   Plaintiff Yaana Pena has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1035.   Plaintiff L.P. had a known "relationship or association" with Ms. Pena, in that she was identified to City Defendants on numerous occasions as her child.

1036.   Plaintiff Yunissa Soto has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1037.   Plaintiff Dwayne Taylor has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that he is deaf.

1038.   Plaintiff Esther Hazel has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1039.   Plaintiff Elizabeth Donegan has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1040.   Plaintiff Marie Gregoire has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1041.   Plaintiff Jesus Ramos has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that he is deaf.

1042.   Plaintiff Filippo Giambianco has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that he is deaf.

1043.   Plaintiff Julie Lopez has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1044.   Plaintiff Demeka Hunter has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

1045.   Plaintiff Jasmine Johnson has a "disability" as defined in New York State Human Rights Law Section 292 (21), in that she is deaf.

**MS. ARMENTA**

1046.   The PATH office, Franklin Shelter and the Samaritan Village Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1047.   Defendants discriminated against Ms. Armenta based on Ms. Armenta's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1048.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1049.   Defendants discriminated against Ms. Armenta based on Ms. Armenta's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1050.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Ms. Armenta.

## BRIM PLAINTIFFS

1051.   The Catherine Street Shelter, Urban Family Center Shelter, Tov-Hotel Bronx Shelter, and the Freedom House Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1052.   Defendants discriminated against Brim Plaintiffs based on Mr. Brim's disability and/or association with persons with disabilities "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith."  NY State Human Rights Law § 296 (2-a).

1053.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1054.   Defendants discriminated against Brim Plaintiffs based on Mr. Brim's disability and failed to make "reasonable accommodations" for their disabilities.  NY State Human Rights Law § 292 (21).

1055.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Brim.

**CASTILLO APONTE PLAINTIFFS**

1056.   The PATH office and the Frant Hotel are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1057.   Defendants discriminated against Castillo Aponte Plaintiffs based on Ms. Castillo Aponte's disability and/or association with persons with disabilities "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith."  NY State Human Rights Law § 296 (2-a).

1058.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1059.   Defendants discriminated against Castillo Aponte Plaintiffs based on Ms. Castillo Aponte's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1060.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Castillo Aponte Plaintiffs.

**MR. SERRANO-COLON**

1061.   The Bellevue Men's Shelter, another Shelter in Brooklyn, Bowery Resident Community Shelter and the Project Renewal Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1062.   Defendants discriminated against Mr. Serrano-Colon based on Mr. Serrano-Colon's disability "in the terms, conditions or privileges of any publicly-assisted

housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1063.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1064.   Defendants discriminated against Mr. Serrano-Colon based on Ms. Mr. Serrano-Colon's disability and failed to make "reasonable accommodations" for him disability. NY State Human Rights Law § 292 (21).

1065.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, and continues to result, in harm to Mr. Serrano-Colon, as Mr. Serrano-Colon will continue to avail himself of The City Defendants' services, benefits, activities, programs, and privileges.

## MS. CRUZ

1066.   The PATH office, shelter in Manhattan, shelter in Queens,  the Franklin Women's Shelter, other shelters are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1067.   Defendants discriminated against Ms. Cruz based on Ms. Cruz's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1068.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1069.   Defendants discriminated against Ms. Cruz based on Ms. Cruz's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1070.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, and continues to result, in harm to Ms. Cruz, as Ms. Cruz will continue to avail herself of The City Defendants' services, benefits, activities, programs, and privileges.

## MS. DOMINGUEZ

1071.   The Brooklyn Women's Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1072.   Defendants discriminated against Ms. Dominguez based on Ms. Dominguez's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith."  NY State Human Rights Law § 296 (2-a).

1073.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1074.   Defendants discriminated against Ms. Dominguez based on Ms. Dominguez's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21). The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Ms. Dominguez.

## MS. ESPINOSA

1075.   The shelter on Staten Island, PATH office, Eden Motel Bronx Shelter, and the Project Hospitality House are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1076.   Defendants discriminated against Ms. Espinosa based on Ms. Espinosa's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1077.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1078.    Defendants discriminated against Ms. Espinosa based on Ms. Espinosa's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1079.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, and continues to result, in harm to Ms. Espinosa, as Ms. Espinosa will continue to avail herself of The City Defendants' services, benefits, activities, programs, and privileges.

## **MR. GARCIA**

1080.   The 30th Street Men's Shelter and the Atlantic Avenue Men's Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1081.   Defendants discriminated against Mr. Garcia based on Mr. Garcia's disability "in the terms, conditions or privileges of any publicly-assisted housing

accommodations or in the furnishing of facilities or services in connection therewith."
NY State Human Rights Law § 296 (2-a).

1082.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1083.   Defendants discriminated against Mr. Garcia based on Mr. Garcia's disability and failed to make "reasonable accommodations" for him disability.  NY State Human Rights Law § 292 (21).

1084.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, in harm to Mr. Garcia.

## GOULBOURNE PLAINTIFFS

1085.   The PATH office and the Bronx Neighborhood Cluster Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1086.   Defendants discriminated against Goulbourne Plaintiffs based on Mr. Goulbourne and Mrs. Goulbourne's disabilities "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith."  NY State Human Rights Law § 296 (2-a).

1087.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1088.   Defendants discriminated against Goulbourne Plaintiffs based on Mr. Goulbourne and Mrs. Goulbourne's disabilities and failed to make "reasonable accommodations" for their disabilities.  NY State Human Rights Law § 292 (21).

1089.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Goulbourne Plaintiffs.

## MR. MOHAMMED

1090.   The 30th Street Men's Shelter and the Kingsboro Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1091.   Defendants discriminated against Mr. Mohammed based on Mr. Mohammed's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith."  NY State Human Rights Law § 296 (2-a).

1092.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1093.    Defendants discriminated against Mr. Mohammed based on Mr. Mohammed's disability and failed to make "reasonable accommodations" for him disability.  NY State Human Rights Law § 292 (21).

1094.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, and continues to result, in harm to Mr. Mohammed, as Mr. Mohammed will continue to avail himself of The City Defendants' services, benefits, activities, programs, and privileges.

## PENA PLAINTIFFS

1095.   The shelter in Manhattan, second shelter in Manhattan, PATH Office, and the Shakespeare Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1096.   Defendants discriminated against Pena Plaintiffs based on Ms. Pena's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1097.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1098.   Defendants discriminated against Pena Plaintiffs based on Ms. Pena's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1099.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Ms. Pena.

**MS. SOTO**

1100.   The PATH office, Franklin Women's Shelter, and Broadway House Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1101.   Defendants discriminated against Ms. Soto based on Ms. Soto's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith."  NY State Human Rights Law § 296 (2-a).

1102.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1103.   Defendants discriminated against Ms. Soto based on Ms. Soto's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1104.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Ms. Soto.

## MR. TAYLOR

1105.   The 30th Street Men's Shelter, BRC Assessment Shelter and the Bronx Park Avenue Shelter are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1106.   Defendants discriminated against Mr. Taylor based on Mr. Taylor's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1107.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1108.    Defendants discriminated against Mr. Taylor based on Mr. Taylor's disability and failed to make "reasonable accommodations" for him disability.  NY State Human Rights Law § 292 (21).

1109.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Mr. Taylor.

## ESTHER HAZEL

1110.   The shelter or shelters attended by Ms. Hazel (i.e., Hopper House and Franklin) are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1111.   Defendants discriminated against Ms. Hazel based on Ms. Hazel's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1112.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1113.    Defendants discriminated against Ms. Hazel based on Ms. Hazel's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1114.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Ms. Hazel.

## ELIZABETH DONEGAN

1115.   The shelters attended by Ms. Donegan (i.e., Bellevue, Family Shelter in Jamaica and Beach Residence) are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1116.   Defendants discriminated against Ms. Donegan based on Ms. Donegan's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1117.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1118.   Defendants discriminated against Ms. Donegan based on Ms. Donegan's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1119.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, and continues to result, in harm to Ms. Donegan, as Ms. Donegan will continue to avail herself of The City Defendants' services, benefits, activities, programs, and privileges.

## MARIE GREGOIRE

1120.   The shelters attended by Ms. Gregoire (i.e., WIN and Bronx Acacia) are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1121.   Defendants discriminated against Ms. Gregoire based on Ms. Gregoire's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1122.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1123.   Defendants discriminated against Ms. Gregoire based on Ms. Gregoire's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1124.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Ms. Gregoire.

## JESUS RAMOS

1125.   The shelters attended by Mr. Ramos (i.e., 30th Street, Wards Island and Bronx Park Avenue) are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1126.   Defendants discriminated against Mr. Ramos based on Mr. Ramos' disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1127.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1128.   Defendants discriminated against Mr. Ramos based on Mr. Ramos' disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1129.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Mr. Ramos.

## FILIPPO GIAMBIANCO

1130.   The shelters attended by Mr. Giambianco (i.e., 30th Street, BRC, BronxWorks) are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1131.   Defendants discriminated against Mr. Giambianco based on Mr. Giambianco's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith."  NY State Human Rights Law § 296 (2-a).

1132.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1133.   Defendants discriminated against Mr. Giambianco based on Mr. Giambianco's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1134.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted in harm to Mr. Giambianco.

## JULIE LOPEZ

1135.   The shelters attended by Ms. Lopez (i.e., PATH and a Bronx shelter) are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1136.   Defendants discriminated against Ms. Lopez based on Ms. Lopez's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1137.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1138.   Defendants discriminated against Ms. Lopez based on Ms. Lopez's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1139.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, and continues to result, in harm to Ms. Lopez, as Ms. Lopez will continue to avail herself of The City Defendants' services, benefits, activities, programs, and privileges.

**DEMIKA HUNTER**

1140.   The shelters attended by Ms. Hunter (i.e., Bellevue and a shelter in the Bronx) are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1141.   Defendants discriminated against Ms. Hunter based on Ms. Hunter's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1142.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1143.   Defendants discriminated against Ms. Hunter based on Ms. Hunter's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1144.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, and continues to result, in harm to Ms. Hunter, as Ms. Hunter will continue to avail herself of The City Defendants' services, benefits, activities, programs, and privileges.

### JASMINE JOHNSON

1145.   The shelters attended by Ms. Johnson (i.e. Bellevue and a shelter in the Bronx) are places of "publicly-assisted housing accommodations" within the meaning of NY State Human Rights Law § 292 (11).

1146.   Defendants discriminated against Ms. Johnson based on Ms. Johnson's disability "in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith." NY State Human Rights Law § 296 (2-a).

1147.   Defendants systematically continue to fail to provide qualified sign language interpreters or other effective means of communication to deaf and hard of hearing clients visiting Defendants' shelter system and housing facilities.

1148.   Defendants discriminated against Ms. Johnson based on Ms. Johnson's disability and failed to make "reasonable accommodations" for her disability.  NY State Human Rights Law § 292 (21).

1149.   The City Defendants' failure to comply with the New York State Human Rights Law has resulted, and continues to result, in harm to Ms. Johnson, as Ms. Johnson

will continue to avail herself of The City Defendants' services, benefits, activities, programs, and privileges.

1150.  By reason of the foregoing, Plaintiffs demand compensatory damages and injunctive relief consistent with the reasonable accommodations noted above requiring Defendants to operate in compliance with applicable laws and regulations.

## REQUEST FOR RELIEF

1151.  WHEREFORE, Plaintiffs respectfully request that this Court:

a. Enter such declaratory and injunctive relief under Title II and Title III of the ADA, Section 504 of the Rehabilitation Act, New York City Human Rights Law, and New York State Human Rights Law against Defendants and in favor of Plaintiffs as it deems appropriate to remedy past violations of the laws of the United States and to prevent future violations of the same, including making available to deaf and hard of hearing individuals, among other forms of relief, to the extent not already being provided pursuant to an existing consent order:

- qualified interpreters;
- auxiliary aids and services;
- displays in each shelter and housing facility indicating availability of ASL interpreters;
- modification of shelter and housing facility forms to ensure ability of individuals to designate ASL as their primary language;
- training for DHS and other personnel regarding the methods of communication employed by the deaf and hard of hearing, and how to ensure effective communications in its shelters and housing facilities;
- provision/designation of an interpreter-ADA accessibility coordinator in each shelter and housing facility who would evaluate the needs of any deaf or hard of hearing individuals;
- changes in policy and procedure to ensure compliance with the law;
- implementation of means of monitoring and reporting non-compliance with the law.

b. Enter judgment against Defendants and in favor of Plaintiffs for such compensatory damages as suffered by Plaintiffs under Section 504 of the Rehabilitation Act, Title II of the ADA and New York State Human Rights Law;

c. Enter judgment against Defendants and in favor of Plaintiffs for such compensatory and punitive damages as suffered by Plaintiffs pursuant to New York City Human Rights Law;

d. Enter judgment against Defendants and in favor of Plaintiffs for the costs of litigation, including reasonable attorneys' fees and costs;

e. Award Plaintiffs any further relief the Court deems appropriate.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby request a trial by jury as to each and every claim for which they are so entitled.

Dated:  October 28, 2016
            New York, New York

                                        Respectfully submitted,


                                        By: _____
                                            Bruce J. Gitlin


                                        New York Center for Law and
                                        Justice
                                        2095 Broadway
                                        Suite 411
                                        New York, New York 10023
                                        (212) 757-2800
                                        bgitlin@lawjusticecenter.org

                                        *Attorneys for Plaintiffs*